## Case No. 6,914.

### The HUNTRESS.

[2 Ware (Dav. 82) 89; 4 West. Law J. 38; 4 Hunt, Mer. Mag. 83; 24 Am. Jur. 486.] [1]

District Court, D. Maine. Nov. 5, 1840.

COMMON CARRIERS—WRONG DELIVERY—MARITIME JURISDICTION OF ADMIRALTY COURTS—JURISDICTION OF FEDERAL COURTS UNDER THE CONSTITUTION.

1. The owners of a steamboat, employed in carrying passengers and merchandise between port and port, are responsible to shippers of goods, as common carriers.

2. Common carriers must, at their peril, deliver goods which they carry to the right persons, and if they make a wrong delivery, they will be responsible for any loss which may be thereby occasioned.

[Cited in The Drew, 15 Fed. 830.]

3. It is the duty of the owner of goods to have them properly marked, and to present them to the carrier or his servants, to have them entered in their books; and if he neglects to do it, and there is a misdelivery and loss in consequence, without any fault of the carrier, he must bear the loss.

4. But the carrier is not discharged from all responsibility, as to the delivery, by such neglect, but if there is a wrong delivery or a loss through any warrant of reasonable caution on the part of the carrier or his servants, he will be responsible.

5. A contract for the transportation of goods on the high seas, when it becomes a subject of litigation, is a case of maritime jurisdiction, within the meaning of that clause of the third article of the constitution, which extends the judicial powers to "all cases of admiralty and maritime jurisdiction."

[Cited in Gloucester Ins. Co. v. Younger, Case No. 5,487; Marsh v. The Minnie, Id. 9,117.]

6. In that clause, the terms "admiralty" and "maritime" are not synonymous. Each has its appropriate use.

7. In the grant of this jurisdiction, it is to be presumed that the words are used in the sense which they had in this country at the time when the constitution was adopted.

8. Where, in the constitution, technical terms of law or jurisprudence are used, which are common to our own law and to the law of England, if there is a difference of signification in the two countries, the meaning which they have in our own country is to be preferred.

9. The jurisdiction of the admiralty courts in this country, at the time of the Revolution, and for a century before, was more extensive than that of the high court of admiralty in England.

[1] [Reported by Edward H. Daveis, Esq. 4 West. Law J. 38, contains only a partial report.]

10. It is a rule in the interpretation of all contracts and other instruments, that if there is anything ambiguous in the terms in which they are expressed, they shall be explained by the common use of those terms in the country where they were made.

11. The terms "admiralty" and "maritime" belong to the law of nations, as well as to our own domestic law, especially admiralty. A court of admiralty is a court of the law of nations, and derives, in part, its jurisdiction from that law. The constitution may, therefore, refer to the law of nations for the meaning of these terms, as constituting part of our own law.

12. One of the rules acted upon by the convention, in the grant of powers to the national government, was to make the judicial coextensive with the legislative power. The regulation and government of maritime commerce is given to the legislature, and by taking the word "maritime," in this clause of the constitution, in its usual and natural sense, the judicial power is made coextensive with that of the legislature.

13. The contemporaneous construction of this clause in the constitution, by the Federalist, by congress—by a series of decisions of the supreme court—and by the uniform practice of all the courts of the Union, continued for sixty years, negatives the hypothesis, that the admiralty and maritime jurisdiction, under the constitution, is identical with that of the high court of admiralty in England; and consequently negatives the assumption, that we are to look for the definition of these words of our constitution, to the statute laws of England as they are enforced by her courts.

This was a libel in personam against the owners of the steamboat Huntress, for the loss of a box of goods shipped by the libellant at Boston, to be delivered to him at Portland. The Huntress was regularly employed in running between Boston and Portland, for the transportation of passengers and goods. The libellant shipped on board of her at Boston, on the 30th of June, three boxes to be carried to Portland, and at the same time he took passage in the boat himself. The boxes all arrived safe, were landed, and put into the storehouse on the wharf. Bonney, the libellant, paid the freight, had them put in a hand-cart, and ordered them to be carried to the Elm tavern. He then went to the tavern, leaving the porter to follow him with the boxes. After he had left the wharf, one of the boxes was claimed by a female passenger as part of her baggage. The mate, with one Adams, a passenger who appeared to be traveling in company with the woman who claimed the box, came on shore, and Adams pointed out the box, and they took it from the porter and carried it back on board the boat. On the box being shown to the woman, she pronounced it to be hers, and said that it contained wearing apparel. It was delivered to her, without any examination of the contents, and she being bound to Hallowell, it was carried on board the Thorn, another boat, which took the passengers of the Huntress which were bound to the Kennebec, and with her carried to Hallowell. This box, it is alleged, contained thirty bonnets, one hat, and ten pieces of Florence platt. The mate, then, thinking

that there either was some mistake or fraud, took the other two boxes and carried them back to the boat. Bonney, having been informed by the porter that there was some mistake about his goods, returned to the boat to inquire into the difficulty. After some conversation with the clerk, the two boxes which remained were restored to him, and the clerk wrote to the agent at Hallowell, to look after the other box, and Bonney went there in pursuit of it. When he arrived at Hallowell, the agent sent for the woman who had taken the box, and she said it was taken by mistake. She went away, and, on being sent for again, was not to be found, but had left the place, and carried one of the bonnets with her. On inquiry, it was ascertained that she had sold the ten pieces of Florence platt, the hat, and three bonnets. The price for which one of the bonnets was sold, $6.25, was brought to the agent. Twenty-five bonnets remained in the box, most of them in a damaged state. The agent offered to return them to Bonney, but he refused to receive them, unless he was paid for the damage and for the articles missing. The clerk of the boat, who was examined as a witness, stated that it was his custom to stand on the wharf to receive the freight which was offered, and that he entered it all in a book kept for that purpose, except small packages, which were carried into the office; that he had no account of the boxes of Bonney in his book, and had no knowledge of their being in the boat until after she arrived at Portland. A notice was posted up in the boat, that no freight would be received within an hour of the time that the boat is advertised to leave the wharf, and requiring all freight to be intelligibly marked, or it would not be received; but the actual knowledge of this notice was not brought home to the libellant. An advertisement was also published in the Portland papers, but it contained no direction as to receiving, or marking, goods for freight. The clerk stated, that the two boxes detained had no marks upon them by which they could be known, but that Bonney pointed out to him his name written with a pencil upon them, but that the lines were so faint and indistinct as to be nearly illegible, and that if he had seen them in the store-house in Boston, he should have left them as unmarked goods. The mate, who delivered the other box to the female passenger, stated that it had no mark upon it, and stated the circumstances of the delivery of it to the woman somewhat differently from the libellant's witness. These differences are noticed in the opinion of the court.

Mr. Fox, for libellant.

W. P. Fessenden, for respondents.

WARE, District Judge. Upon the facts proved in this case, the libellant claims to recover of the owners of the boat, the value of the merchandise he has lost, as he alleges, through the carelessness and misconduct of their agents. There can be no doubt that the owners of the boat are subject to all the liabilities of common carriers. It is proved that she was regularly employed in running between Portland and Boston, for the conveyance of passengers and merchandise. A common carrier is one who makes it a business to transport goods, either by land or water, for hire, and holds himself ready to carry them for all persons who apply and pay the hire. 2 Kent, Comm. 598; Dwight v. Brewster, 1 Pick. 50. Undertaking, as he does, to carry goods for all persons, he is considered as engaged in a public employment, and as engaging beforehand to carry goods for a reasonable remuneration for any person who may apply to him and pay the hire, and he will be liable to an action for refusing, unless he has a reasonable cause for his refusal. Story, Bailm. § 502. The law, for strong reasons of public policy, holds him to a very rigorous responsibility. He is answerable not only for his own acts, but for those of his agents and servants. Among the obligations which common carriers take upon themselves, as resulting from the nature of their employment, is that of delivering the goods, when they are transported to the place of destination, to the proper person. If they are delivered to a wrong person, and any loss or damage ensues in consequence, they are responsible to the owner. Golden v. Manning, 3 Wils. 429; Garnett v. Willan, 5 Barn. & Ald. 53. And when the goods are lost or damaged, the onus probandi is upon the carrier, to prove that the loss was occasioned by some cause for which the law will excuse him. Story, Bailm. 529. It is in evidence, that the box in question belonged to the libellant, that a part of its contents has been lost, and that the greater part of what remained has been materially damaged, and the burden of showing that the loss and damage occurred under such circumstances as will exempt the owners from their responsibility, is thrown upon them.

The counsel for the respondent contends, in the first place, that the box had been delivered to Bonney, and that they were therefore discharged from all their liabilities. The facts, as they are stated by the libellant's witnesses, Watts, the keeper of the store-house, and Potter, the porter, are that the three boxes were landed and put into the respondents' store-house; that Bonney employed a porter to carry them to the tavern, and had them put in his cart; that, after he had left the wharf, a claim being made, by by another passenger, of one of the boxes, the mate came on shore with Adams, and they took the box, carried it again on board the boat, and delivered it to the woman who claimed it. Now, if it should be admitted that here was such a delivery as would discharge the owners from all further responsibility, had nothing more been done, although the box had not been actually removed from their store-house, it is quite as clear from

this evidence that the delivery was revoked, not merely as to the box in question, but as to all of them. It is quite impossible to put any other construction upon the act of a mate, in taking all the boxes and replacing them on board the boat, after Bonney had left the wharf, than that it was a revocation of the delivery. The goods were again in the possession of the respondents, by the act of their servants, and all their responsibilities as common carriers re-attached. It was contended at the argument, that the goods having been once delivered, the retaking of them was the private and unauthorized act of the mate, for which the owners are not accountable; and if there is any responsibility, it is only the private and personal responsibility of the mate, or of the mate and Adams. But the mate did not interfere in the business as a stranger; he interposed in his quality, and with the authority of mate, and as a servant of the owners, having a right to retain the goods. It is the appropriate duty of the mate to superintend the loading and unloading of the goods taken on freight. It is true, that if a dispute arises between different persons claiming the same goods, the proper person to decide this dispute is the clerk, because he takes the account of the goods. But if the mate volunteers to decide the dispute, and delivers them to a wrong person, the most that can be said is, that he is acting beyond the line of his proper duty, and may be answerable to his employers; but they are responsible to the owner, for they are as much responsible for the acts of their servants as for their own.

The mate in his deposition, gives a different account of the affair. He says that Adams informed him that a man had taken a wrong box on shore, and he then went ashore, and took and carried it on board the Thorn. Afterwards, he adds, that upon reflection he is satisfied, that Adams went ashore and took the box on board the Thorn, before speaking to him; that he then went on board the Thorn, examined the box and found no mark upon it; that he asked the woman if it was hers, to which she replied that it was, and had wearing apparel in it. Without opening the box to verify her statement, he allowed her, upon her word alone, to retain the box, and she carried it with her to Hallowell. Now, in the first place the testimony of the mate is objected to, as that of an interested witness. He, with Adams having taken the box from the porter and delivered it to a wrong person, without consulting and taking the direction of the clerk, it is argued, is answerable over to his employers for any damage which may be recovered against them, and has therefore a direct interest to prevent a recovery. And if it be conceded that he exculpates himself by his own statement, that is overcome by the plain, direct, and positive testimony of two disinterested witnesses, by whom he is flatly contradicted. My opinion, upon the facts which

have been proved is, that if there had been a delivery, it was revoked by the same authority by which it was made, and that the respondents are not for that cause exonerated from their responsibilities as common carriers.

In the second place, it was contended at the argument, that the owners of the boat are not responsible, because no contract of affreightment for the carriage of the goods intervened between the parties, but that they were surreptitiously put on board by the libellant, or by his procurement, without the knowledge of the clerk of the boat, and without being properly marked so that it could be known to whom they belonged. No evidence was offered to show by whom or by what means the goods were brought on board. They were not brought to the notice of the clerk, and were not entered on the freight list. The contract of affreightment, or that for the transportation of goods by a common carrier, like all other contracts, requires for its completion the consent of parties, either express or implied. If goods, says Pothier, are put on board a vessel without the knowledge of the master, there is no contract, and consequently no obligation on one part or the other; and therefore the master, who finds the merchandise in his vessel, may put it ashore, and charge the expense of unlading to the owner. The French legislation has provided for this case by a special article. The master may discharge the goods found on board his vessel, without being made known to him, or he may carry them, and charge the highest freight paid for merchandise of the same quality. Ordonnance de la Marine, liv. 3, tit. 3, art. 7. Valin and Pothier teach us that, if he does not discover them until after he sails, provided the vessel is overloaded, he may discharge them, at an intermediate port, before the end of the voyage, leaving them in the hands of some solvent merchant, and giving the owner notice; but if the vessel is not overcharged, he ought to carry them to the port of destination. 1 Valin, 647; Pothier, Traité de Contrat de Charter Partie, Nos. 10, 12. This obligation does not arise from the contract of the parties, because no contract has intervened, but results from the principles of natural law, the great law of social charity, which commands us on all occasions to promote the well being of others, when it can be done without a sacrifice for ourselves, and not to do an act, though permitted by the positive law, which will be materially injurious to another, without any corresponding benefit to ourselves. The Code de Commerce adopts the morality of Pothier, and confines the right of the master to discharge the goods at the port where they are laden. No. 292, 2 Boul.-P. Dr. Com. p. 373, tit. 2, § 5. If these principles ought to govern in the case of a common freighting vessel, and they are recommended as well by public convenience as by their pure and honorable morality, they apply with much greater force to cases like the present. The boat

was, in the strictest sense of the word, a common carrier, making her trips daily between Portland and Boston. Her goods on freight were owned by a great variety of persons, were brought in small quantities, loaded in a hurry, ordinarily without the formality of a bill of lading, and often, as in this case, accompanied by their owners. The owners of the boat, by the nature of their employment, engaged, and were bound to take the goods of all persons who offered them, without any special contract for that purpose. Holding themselves out generally, as ready to carry freight or passengers, the public have a right to take them at their offer, and they are not at liberty to refuse, without good cause; and those who wish for a passage, or have goods to be transported, need not take the trouble to make a contract beforehand. They understand that the master is bound to allow them a passage, and to carry their merchandise, unless he has some valid excuse, and they go down to the boat prepared to go on board and take their goods with them. Now it appears to me, that if the goods are put on board in the ordinary manner, a contract results from the fact itself. In the present case, the owners of the boat held themselves out as ready to carry freight for all persons generally, and if the libellant had his goods carried to the wharf, and they were taken on board in the usual course of the business, as other goods were, he accepted their offer, and it appears to me that the contract was complete; but if it was not, it was ratified and made perfect by the payment and acceptance of the freight. This was the decision of the Roman law. Whether the goods, says Ulpian, are shipped by a bill of lading or not (for this seems to be the meaning of ei assignatae, translated into modern nautical phraseology), the contract is complete by the simple fact that they are laden on board; the carrier becomes responsible for their safety.[2]

It is true, that if goods are furtively put on board by the owner, and there is an apparent desire to conceal them, a presumption would naturally arise, that the owner intended to defraud the carrier of his compensation for his services. Such conduct might rebut the presumption of an implied contract, and a question might be made whether the acceptance of the freight was a waiver of the wrong, so as to subject the carrier to all the responsibilities which would result from a contract. But that question does not arise in this case, because there is no evidence tending to create any suspicion of that kind, against the libellant. Regularly, without doubt, the clerk of the boat ought to be notified, and, for his own security, the shipper ought to see that his goods are entered on the freight list. But in the hurry and confusion in which the business is often done, it would be a harsh presumption to assume that fraud was intended from this neglect alone. It is certain, also, that the goods ought to be plainly and legibly marked, so that the owner or consignee may be easily known; and if, in consequence of omitting to do it, without any fault on the part of the carrier, the owner sustains a loss, or any inconvenience, he must impute this to his own fault. It is certain, that the box had not such plain, intelligible marks upon it, as would readily point out the owner. He probably thought, as he was in company with his goods, that this was of less importance. But it was a fault on his part, and the natural and necessary consequence of that fault he must bear. But his fault will not excuse the fault of the carriers or their servants. They are not liberated from all care and responsibility, because the shipper has not placed proper marks on his goods. Bonney took, and paid the freight of, the three boxes. They were landed, and he had them delivered to a porter, and ordered them to be carried to his lodgings. Here was abundant proof that he claimed them. But now, after Bonney had left the wharf, in the confidence that his goods would follow him, comes forward another claimant. She gave no better proof of title than Bonney. If the box was not marked for him, neither was it for her. Yet without any examination, without even taking the trouble to open the box, and see whether it contained, as the woman alleged, her wearing apparel, and in the absence of Bonney, who had paid the freight to the mate himself, it was delivered over to her. No one can hesitate to say, upon the simple statement of the facts, that there was, in this, undue precipitancy and a want of due caution on the part of the mate. Nor will any man of ordinary prudence and caution, pretend, that this is the way in which opposing claims to property ought to be settled. The woman passenger had declared what the box contained, if it belonged to her. If Bonney had been sent for, and the question had been asked him, the adverse claims would have been satisfactorily settled on the spot. The delivery to one of the claimants, in the absence of the other, without any further inquiry, was a gross fault on the part of the mate, and as the owners of the boat are responsible for the acts of their servants, it is imputable to them. My opinion, therefore, is, that the owners are liable. And as the respondents refused to make him any compensation for the loss and damage of his goods, he was justified in leaving them upon their hands, and looking to them for their value. Decree for libellant.

NOTE.—In this case the question of jurisdiction was not raised by the counsel, nor adverted to by the court. The competency of the court to pass upon such questions had been, in this district, maintained in several cases in which the same general question

---

[2] Recipit autem salvum fore, utrum si in navem res missae ei assignatae sunt, an etsi non sint assignatae. hoc tamen ipso quod in navem missae sunt receptae videntur. Dig. 4, 9, 1, § 8.

was involved. Here it had been supposed, that a contract for the transportation of goods on the sea was clearly within the jurisdiction of the court, as a maritime contract. If in the clause in the constitution, repeated in the judiciary act, "all causes of admiralty and maritime jurisdiction," the word "maritime" has any meaning and was not used merely for the purpose of rounding the phrase, it must include such a contract; and we are not gratuitously to suppose that words. in the constitution, were used without meaning. Besides, the service of the seamen is not denied by any to be a maritime service, and as such a proper subject of maritime jurisdiction. This service consists in the transportation of the goods. The ship-owner. as a carrier, performs it by his servants, the master and ship's company. To admit the jurisdiction in one case, and deny it in the other, is to affirm of the same service, that it is and that it is not maritime, or else to affirm that the term maritime, as used in the constitution, is an unmeaning expletive, a supposition so preposterous. not to say indecent to the memory of the illustrious statesmen who framed that instrument, that it is not to be for a moment entertained.[3]

But in the recent case of New Jersey Steam Nav. Co. v. Merchants Bank, 6 How. [47 U. S.] 344, agreeing precisely in its principal features with this case, the question whether the court had jurisdiction over the cause, as one arising on contract or growing out of a maritime service, was raised by counsel, and argued at great length. The libel was sustained, and the jurisdiction of the court vindicated in a very able opinion of Mr. Justice Nelson, on the ground that the contract and the service were maritime, and his opinion had the concurrence of three of the other judges, including the chief justice. Two of the judges concurred in the judgment on the ground of tort, and one denied the jurisdiction altogether. The authority of the court to take jurisdiction in these cases being brought into such grave doubt. it seems not inappropriate to add, as a sequel to the opinion on the merits of this case, a few observations on this subject. If they have no other value, they will serve to show that the juris-

diction, over such cases, has not been taken by the court without some consideration and reflection on the subject.

In these, and in analogous cases, the only question that can be considered as an open one is, whether they come within that clause of the constitution which says, the judicial power of the United States shall extend to "all causes of admiralty and maritime jurisdiction." If they do, then the original cognizance of them is. by the ninth section of the judiciary act, given to the district court. The question then carries us back to the constitution; and if we are to apply, to the interpretation of that, the same rules and principles which courts apply to the interpretation of all other instruments, it is difficult to conceive where the most subtle ingenuity will find a loop to hang a doubt on. No court ever pretended to an authority to strike from a solemn instrument any word that had a plain and sensible meaning in the place where it was found, unless it was repugnant to the tenor of the whole instrument, or plainly and irreconcilably contradictory to some other part of it. Such a decision can stand on no other grounds than the hoc volo, sic jubeo. It must then be conceded, unless this can be made apparent, that the word maritime stands a part of the constitution, either as a significant word, or an unmeaning pleonasm.

I do not now recollect, that it ever has been seriously contended, that such causes can be excluded from the jurisdiction of the courts of the United States, by any interpretation of the words of the constitution, taken by themselves. The argument, that this clause is controlled by the seventh amendment, which secures the right of trial by jury in all suits at common law, where the value in controversy exceeds twenty dollars, has no application to the constitutional grant; because these are not suits at common law; and further, because congress may provide for the intervention of a jury, on the trial of a cause on libel and answer, as well as in a suit according to the forms of the common law. And if the objection has any weight, it applies. with precisely the same force. against the jurisdiction in all cases in equity. Accordingly we find that those who deny the jurisdiction, drop all the ordinary rules of interpretation of written instruments. and resort to matter dehors the constitution. to determine the meaning of this clause. It is contended. that we are not to take the plain and obvious meaning of the words, nor to interpret them by reference to other parts of the same instrument, but that their meaning is to be ascertained by a reference to the usages, jurisprudence and laws of England. usages that never prevailed. and laws that were never in force here.[4]  In a word, that

---

[3] If the word "maritime" is merely exegetical of "admiralty." one word includes the other, and they may be used interchangeably. Admiralty is maritime jurisdiction. and maritime is admiralty jurisdiction, without limitation or exception. But it is well known that the admiralty jurisdiction is twofold. a prize jurisdiction exercised jure belli, extending to all captures in war, as prize. whether on sea or on land; and a civil jurisdiction over causes civil and maritime, springing from a consideration purely maritime. They are so distinct that it has been doubted, in England. whether the judge of the admiralty court can exercise both jurisdictions under one commission. 2 Brown. Civ. & Adm. Law, c. 1, p. 29; Id., c. 6, p. 208; &c.; Lindo v. Rodney, Doug. 613, note. The addition of the word "maritime," in the constitution, closes the door against all doubt or cavil whether both branches of the jurisdiction are granted. See 2 Brown, Civ. & Adm. Law, 210.

[4] For more than a century before the formation of the constitution. that is, from the early part of the reign of Charles II. revenue causes had been heard and tried in the colonies by courts of vice admiralty. How extensively the

the framers of the constitution meant, by the words "all causes of admiralty and maritime jurisdiction," precisely that jurisdiction that was exercised by the high court of admiralty in England. In our jurisprudence, these terms, certainly the former, "admiralty," had always borne a different and a larger signification than that which they had in the jurisprudence of England. The jurisdiction was here more extensive. Not to rely on any debatable point, it is certain that it included revenue seizures on navigable waters, which were never within that of the high court of admiralty, but belonged exclusively to the court of exchequer. Now the assumption is, and it is made without a tittle of proof, unless general argument is to be taken as proof, that the framers of the constitution, silently, and without the slightest notice, referred, for the sense of these words,

not to the meaning which they had in our jurisprudence, but to that which they bore in the jurisprudence and laws of England. If the fact be so, we will venture to affirm that it is a fact unique in the history of the world. It may safely be said, that no man, and no other body of men, engaged in framing an organic law for the government of a great nation, ever, silently and without notice of any such intention, referred, for the sense and meaning of any of their words, to the signification which they had in laws and jurisprudence of a foreign nation, especially if these words had a well-known meaning in their own country.

We may here be met by an argument, that the constitution does, in fact, refer to the common law for the definition of words, by the use of technical terms of that law, as "habeas corpus," "trial by jury," etc., without proceeding to define them. But these words were just as familiar in our law, as in that of England. And if, by supposition, there had been any difference in the sense in which they were used in the English statutes and common law, and that in which they were generally used and understood in this country, can there be a doubt which sense is adopted by the constitution? The common law, and of course the sense in which the technical words of that law are used, was never in force in this country, any further than as it was adopted by common consent, or by the colonial legislatures. Beyond this, it was as much a foreign law as that of France or Holland; and for the definition of any technical terms of general law or jurisprudence we may, with just as much propriety, refer to the laws of any other foreign country as to those of England, except so far as the law of England has been adopted and incorporated into our own laws and jurisprudence. And where the same words have a different import in the two countries, that which prevails in our own is most certainly to be preferred.

It is again said, that the extension of the jurisdiction of the vice admiralty courts, in the colonies, to revenue causes, was one of the grievances of which they complained, and which, with others, led to the revolution. From this fact it is argued, that it is to be presumed, that in defining this jurisdiction, the framers of the constitution would adopt that limited jurisdiction which was sought and claimed from the mother country. The answer is, that if the convention had intended to do it, they would have taken care so to express themselves as to leave the subject free from doubt. So far from doing this, they have in the grant of this jurisdiction employed terms that in their ordinary and natural import clearly negative the supposition that the restricted jurisdiction of the high court of admiralty was intended. The fact, of the alleged grievance and of the complaint, is admitted, but the argument draws the wrong inference. On every prin-

jurisdiction was, in practice, exercised by the courts, as instance courts, cannot probably now be ascertained with certainty. The commissions of the judges prove, that the restraining statutes of Richard II., according to the construction given to them by the common law judges in England, were not in force in the colonies. The following is a copy of one of these commissions to an admiralty judge of the colony of New Hampshire, as quoted by Judge Story (De Lovio v. Boit [Case No. 3,776]). It authorizes him "to take cognizance of, and proceed in all causes civil and maritime, and in complaints, contracts, offences or suspected offences, crimes, pleas, debts, exchanges, accounts, charter-parties, agreements, suits, trespasses, inquiries, extortions, and demands, and business civil and maritime whatsoever, commenced or to be commenced between merchants, or between owners and proprietors of ships and other vessels, and merchants or others whomsoever with such owners and proprietors of ships and all other vessels whatsoever employed or used within the maritime jurisdiction of our vice-admiralty of our said province, etc., or between any other persons whomsoever had, made, begun or contracted, for any matter, thing, cause or business whatsoever done, or to be done, within our maritime jurisdiction aforesaid, etc., etc.; and moreover in all and singular complaints, contracts, agreements, causes and businesses, civil and maritime, to be performed beyond the sea or contracted there, however arising or happening," with many other general powers. And it declares the jurisdiction to extend "throughout all and every the sea shores, public streams, ports, fresh waters, rivers, creeks, and arms, as well of the sea, as of the rivers and coasts whatsoever of our said province," etc. In Stoke's History of the Colonies, Judge Story observes, there is a commission similar in its main clauses, which Mr. Stokes says was the usual form of the commissions of the colonial admiralty judges. Story, Const. § 1659, note 1. The jurisdiction exercised in fact, probably varied in different colonies, and in the same colony under different judges. That conferred by the commission extends to all that was ever claimed by the admiralty; and the best evidence of the rightful jurisdiction of the court undoubtedly is, the commission of the judge. Stokes was chief Justice of the royal province of Georgia. His work "On the Constitution of the British Colonies," is referred to and quoted more at large by Mr. Justice Wayne, in his very learned and able opinion in the case of Waring v. Clarke, 5 How. [46 U. S.] 454. Stokes says that all the commissions were alike, and Judge Wayne adds, that "the king's authority to grant these commissions never has been, and cannot be denied."

ciple of sound reasoning, the precisely opposite inference is the just one. The whole matter of the controversy and complaint were fresh in the minds of the convention. They perfectly well knew the enlarged and restricted jurisdiction of the admiralty, and they seem studiously, by adding the word "maritime," to have chosen words that gave the larger instead of such as would give the narrower jurisdiction. Notwithstanding the admitted fact, that the admiralty jurisdiction had been viewed with jealousy and distrust while we were colonies, it does not follow that either the convention or the people would have any hostility to it under the new government. It was probably supposed, that the revenue laws would be more steadily and systematically enforced by the courts than by juries, and this is precisely what would be desired by both the people and the government, by all except the brotherhood of smugglers.[5] While the colonial state remained, the people would naturally feel an objection to leave the decision of revenue causes to the court instead of the jury. The judges were strangers, and sent from abroad. They brought with them all the prejudices and partialities of Englishmen, in favor of their own country and people, and to this was added the bias, which the officers of the crown are always supposed to have, in favor of its prerogatives. Such officers were naturally viewed with jealousy and distrust. But under the constitution, a new order of things arose. The judges were our neighbors and kinsmen, and responsible to our own government. And the people might be willing to trust a larger measure of power to these than they would willingly see exercised by strangers and foreigners. There was no longer any foundation for the jealousy, and it no longer existed.

We have said, that to ascertain the sense in which words are used in the constitution, we are to look to the meaning which they had in our own country, and for the meaning of the technical language of jurisprudence, we are to look to the laws and jurisprudence of our own country, if the words there had acquired a plain and positive meaning.[6] This, perhaps, may require some explanation. The terms, "admiralty" and "maritime," belong to the law of nations, as well as to our

own domestic and municipal law. This is peculiarly true, of the former, admiralty. A court of admiralty is a court of the law of nations, and in one branch of its jurisdiction, that of prize, both the law and jurisdiction are derived solely from the law of nations, and on the instance side of the court, in many cases, as when the controversy is between parties of different nations, its rule of decision, whether relating to the law of the case or the jurisdiction of the court, is not always to be taken from the municipal law of either of the parties, but from that general maritime law which governs all on the common highway of nations. It has therefore been supposed by some jurists of great eminence, that, for defining the jurisdiction of the court, that is, for determining the meaning of this clause of the constitution, we are not to look to the jurisprudence of any one people in particular, but to that common and universal law that is acknowledged by all Christian and maritime nations.[7] But, perhaps, in the rule which is

_____

[5] This is the reason given by Judge Chase, why revenue seizures were, by the act of congress, put on the admiralty side of the court. [U. S. v. The Betsy and Charlotte] 4 Cranch [8 U. S.] 446.

[6] It is a universal rule dictated by common sense, for the interpretation of contracts, and equally applicable to all instruments, that if there is anything ambiguous in the terms in which they are expressed, they shall be explained by the common use of those terms in the country where they are made. Poth. Obl. No. 94. Domat. Les Lois Civiles, liv. 1, § 2, No. 11. Semper in stipulationibus et caeteris contractibus id sequimer quod actum est, aut si non pareat quid actum est, erit consequens, ut id sequimer quod in regione in qua actum est frequentatur. Dig. 50, 17, 34.

[7] This was the opinion of Judge Story. De Lovio v. Boit [Case No. 3,776]. In the case of Davis v. The Seneca [Id. 12,670], decided in 1829, Judge Washington says, "As preliminary to the investigation of this question. I not only admit but insist: First, that the judicial power of the United States under the constitution, and the jurisdiction of the district courts under the 9th section of the judiciary act of 1789 [1 Stat. 76], embrace all cases of a maritime nature, whether they be particularly of admiralty cognizance or not. Second, that this jurisdiction, and the law regulating its exercise, are to be sought for in the general maritime law of nations, and are not confined to that of England, or of any other particular maritime nation." It is supposed that the late Chief Justice Marshall fully concurred with Judges Washington and Story on this subject. The jurisdiction of the admiralty in England, before the statutes of Richard II. and Henry IV. and the construction put upon them by the common law courts, it is admitted, was as large as that of courts of admiralty in other maritime nations of Europe. It is certain that these laws did not originally extend to the colonies because the colonies were not then in existence. If they were ever in force here they must have been subsequently adopted. But the commissions from the crown to the vice admiralty judges, show most conclusively that they never were adopted. These confer all that general jurisdiction over maritime causes, that was anciently exercised by the admiralty court of England, and has always been by the admiralty and maritime courts of every other country of Europe. If these laws, with their construction, were in force in this country, then all these commissions were illegal, because a commission from the crown could not abrogate an act of parliament. But it was never pretended that these commissions were illegal. It follows, therefore, whether we refer for the meaning of these terms to the general maritime law of nations, or to the well known and well established laws of our own country, that we are brought to the same conclusion. For the jurisdiction of the admiralty in this country, prior to the adoption of the constitution, I would refer to the opinion of Judge Wayne, in the case of Waring v. Clarke, 5 How. [46 U. S.] 454, 458. In that very learned and able opinion it is conclusively shown, that the admiralty jurisdiction of England was not that exercised and acknowledged in this country. It was here larger, and, by the commission of the judges, as ample as it

stated above, I differ rather in the formula in which it is expressed than in the substance of the rule itself. The law of nations is not the exclusive law of any particular people. It is the common property and common law of all, and, as such, is part and parcel of our own law. If, then, we recur to this general law for the definition of these terms, in one sense we are not going beyond our own law. Now, in this common law of the sea, we find these words, as understood by every people in the commonwealth of commercial and maritime nations, with the exception of England, to have a more comprehensive sense than that which confines them to the jurisdiction exercised by the high court of admiralty. If no valid reason for limiting the admiralty and maritime jurisdiction of the courts of the United States, by applying to the interpretation of these words the laws of England, is found in the language of the constitution granting it, as little will be found, when we turn our attention either to the general tenor of that instrument, or to other special powers granted by it. In the Federalist, universally admitted to be the best commentary on the constitution that has yet appeared, written principally by two of the members of the convention, who had more agency in giving to it its substance and form than any others, it is said, "If there are any such things as political axioms, the propriety of the judicial power of a government being coextensive with its legislative, may be ranked among the number." No. 80. It appears to me, that nothing can be more certain than that this axiom was steadily kept in view by the convention. Now, the power of regulating, that is, the general control over, commerce with foreign nations, and between the states, is granted, by another article of the constitution, to the legislative department. This covers the whole maritime commerce of the country. The grant to the judicial department, of the cognizance of all causes of maritime jurisdiction, makes the judicial coextensive with the legislative power. This is the only way in which we could be assured of having, what is so important to a commercial nation, a uniform maritime law, in all the states of the Union. It is unnecessary to expand the argument. Every mind disciplined by habits of juridical reasoning and experience, which has reflected at all on the mechanism and operations of civil government, will feel the conclusion to be irresistible, if we suppose that the convention felt the value and force of this axiom, as they were felt by the Federalist. That the writers of the Federalist only shared and expressed the common feeling and opinion of the convention, is, I think, proved by their

anciently was in England. From the want of reports, it is impossible to say how extensively the jurisdiction was ordinarily exercised, but it was certainly, in practice, more extensive than in England.

work. The judicial is, by the constitution, made coextensive with the legislative power. It is not essential that this jurisdiction, in maritime causes, be exercised in all cases by the court alone, as is most usual in the admiralty. Congress may provide for the appointment of assessors, as is not unfrequently done by the court itself, from its own inherent authority, or for the intervention of a common jury.

Thus far the subject has been considered as an original question, precisely as it presented itself, sixty years ago, to the first judicial tribunal that had to pass upon it. To us, however, it does not present itself as a naked question of original speculation. It comes prejudged by a contemporaneous construction, and by the uniform and unvarying practice of more than half a century. In looking for the contemporaneous construction of the constitution, our attention is naturally first turned to the Federalist. The eightieth number treats of the extent of the judicial power. In that, Gen. Hamilton says, "It seems hardly to admit of controversy, that the judiciary authority ought to extend to these several descriptions of cases." He enumerates five classes, the fifth of which is, "all those which originate on the high seas, and are of admiralty or maritime jurisdiction." After commenting more at large on the previous classes, he adds: "The fifth point will demand little animadversion. The most bigoted idolizers of state authority have not thus far shown a disposition to deny the national judiciary the cognizance of maritime causes." The commentators on the Code Napoleon habitually refer to the discussions at the tribunate, and in the council of state, on the several articles of the Code, as of high authority in the interpretation of any doubtful or ambiguous language. We have not, for our aid in explaining and opening the sense of any obscure article in our constitution, the benefit of the debates upon it in the convention; but we have what all will admit to be of equal, if not of much higher authority. We have a commentary, deliberately prepared by three of the most accomplished statesmen which this country has yet produced, published immediately after the constitution was made, while all the discussions were fresh in their minds, and before it was adopted by the people. The number quoted was written by Gen. Hamilton, but it is fair to presume that all concurred in the general opinions that were entertained by each. Can any one suppose, when it is said that the judicial power under the constitution extends to all cases, that arise on the high seas; when afterwards recurring to the subject, seemingly ex industria, the word "admiralty" is dropped, and the word "maritime" used alone, as descriptive of the constitutional jurisdiction, thus presenting it as the leading and important feature in the clause; I ask, can any man imagine that the Federalist supposed

that the cognizance of maritime causes, intended to be given to the courts of the United States, was confined to the narrow and jejune jurisdiction, allowed by Lord Coke and his followers to the admiralty court of England? Were Gen. Hamilton, Chief Justice Jay, and Mr. Madison so ignorant of the common-places of the law of England, as not to know that the admiralty in England, instead of having jurisdiction over all cases that arise on the high seas, was allowed to take cognizance of but a very small number of them?

We have in the judiciary act (Sept. 24, 1789, c. 20 [1 Stat. 76]) a contemporaneous construction of this clause of the constitution, of the highest authority. In apportioning to the several courts the judicial power, the ninth section assigns to the district court "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." [8]　If

this act is not unconstitutional, it is perfectly decisive of the whole subject. It negatives, beyond the possibility of doubt or controversy, the hypothesis that limits the admiralty and maritime jurisdiction of the courts of the United States, under the constitution, to that allowed by the common law courts of England to the high court of admiralty. Revenue causes were never within the admiralty jurisdiction in England, but always belonged exclusively to the exchequer. But in this country, for more than a century, these causes had been heard and decided by courts of vice admiralty. Congress, therefore, must have considered that the words of the constitution were used, not in the sense which they had in the laws of England, as expounded by Lord Coke, and by the common law courts on writs of prohibition, but in the sense which they bore in the jurisprudence of our own country. This law was made by the first congress that met under the constitution. How many of its members had borne an active part in the convention in framing the constitution, I have not at hand the means of determining. But in one branch, the senate, then consisting of twenty-two senators. six, that is, more than one-fourth of the whole number, had been members of the convention.[9]　Was there no one of these, Robert Morris, for instance, who could inform the senate in what sense the words of this clause were understood by the convention? In that senate, also, were Oliver Ellsworth, Rufus King, and Richard Henry Lee. They had not, indeed, been in the convention; but surely such men were not ignorant of the sense in which these words were understood at that time; nor did Chief Justice Ellsworth require long homilies to be read from the horn books of the law, to inform him that revenue seizures were not, by laws of England, civil causes of admiralty jurisdiction. The law passed. and I am not aware that any opposition was made to this part of it. It went into opera-

[8] This act bears internal marks of having been prepared with great care, by men who well understood the state of the law. This clause is a proof of it. In the case of U. S. v. The Vengeance, 3 Dall. [3 U. S.] 297, the court decided that a revenue seizure, made on the water, was a civil cause of admiralty and maritime jurisdiction. Independent of the local law and the usages of this country, it is not properly a cause of admiralty jurisdiction. In the celebrated case of The Columbus, in 1789, Sir James Marriot says, that "the court of admiralty derives no jurisdiction in causes of revenue from the patent of its judge. or from the ancient, customary. and inherent jurisdiction of the prerogative of the crown in the person of the lord high admiral." 1 Coll. Jurid. p. 97. As an instance court. it takes cognizance of maritime contracts and torts between party and party, by virtue of its general and inherent power. Its jurisdiction in revenue causes is superinduced by special acts of the legislature, but does not belong to it merely as a maritime court. In this country, revenue causes had so long been the subject of admiralty cognizance, that congress considered them as civil causes of admiralty and maritime jurisdiction, and to preclude any doubt that might arise, carefully added the clause, "including," etc. This is a clear proof that congress considered these words to be used in the sense which they bore in this country, and not in that which they had in England. The act gives exclusive admiralty and maritime jurisdiction to the district court. As a court of the law of nations, as a court of prize, its jurisdiction is. and was intended to be, in every sense. exclusive of that of the state courts. As a maritime. or instance court, its jurisdiction is also exclusive where the remedy can be given only by a court of admiralty. But in cases where the courts of common law have always exercised a concurrent jurisdiction, the jurisdiction is not, and was never intended by the constitution to be, exclusive, though the subject-matter be maritime. To take the familiar case of mariner's wages; if they mean to look to the vessel, and proceed on the maritime hypothecation, they must go to the admiralty; the jurisdiction is ex-

clusive, because the hypothecation cannot be enforced in a suit according to the forms of the common law. But if they proceed in personam against the master or owners, no man ever doubted that the courts of common law have jurisdiction. But here, to preclude the possibility of doubt, congress added the clause saving to suitors a common law remedy where that law could give it. Saving to suitors: undoubtedly to the creditor party, the actor. He has his choice of jurisdiction, and the debtor party must abide that jurisdiction. as in common sense and common right it ought to be; as it in fact is in all other cases of concurrent jurisdiction, between that of common law and equity, as well as between common law and admiralty. The case of The Columbus is quoted by Brown as The Columbia, decided in 1782. The whole case will be found in the first volume of the Collectanea Juridica. a curious, and, in this country, rare collection of law tracts, published in London, in 1791.

[9] William Samuel Johnson, of Connecticut. Robert Morris. of Pennsylvania. George Reed and Richard Bassett. of Delaware. John Blair, of Virginia. Pierce Butler, of South Carolina, and Wm. Few, of Georgia.

tion, and was brought of necessity to the attention of the courts at every session. But for seven years we hear no word of complaint from any district in the Union, of this part of the act. If it was so gross and palpable a violation of the constitution, as it certainly was if the words of this clause are to be measured by the sense which they had in England and not by that which they had in this country, we may well ask, with some feelings of surprise, where, during these seven years, were slumbering the watchmen of our American Israel?

The first case in which the question was raised was that of U. S. v. The Vengeance (1796) 3 Dall. [3 U. S.] 297. The vessel was seized for a violation of an act of congress, of May 22, 1794 [1 Stat. 369], prohibiting, for a limited period, the exportation of arms and ammunition. The vessel was condemned in the district court, and on appeal the decree was reversed by the circuit court, and a decree of restoration pronounced. From the circuit court the case was carried, by writ of error, to the supreme court. On the opening of the case, the court, supposing the attorney-general did not intend to enter into any further discussion, expressed their opinion; but being informed by Lee, the attorney, that on account of the importance of the subject he wished to be heard further, they gave him time. In his argument, he took the ground that this was not a cause of admiralty and maritime jurisdiction, because it was not so in England at the time of the Revolution. After he had closed his argument, the chief justice (Ellsworth) informed the opposite counsel, that the court saw no reason to change the opinion which they had expressed on opening the cause, and that they would dispense with further argument; and the next day pronounced the following judgment: By the Court. "We are perfectly satisfied upon the two points that have been agitated in this cause. In the first place, we think it is a cause of admiralty and maritime jurisdiction. The exportation of arms and ammunition is simply the offense, and exportation is entirely a water transaction. It appears, indeed, on the face of the libel, to have commenced at Sandy Hook, which must certainly have been on the water. In the next place, we are unanimously of opinion that it is a civil cause; it is a process of the nature of a libel in rem, and does not, in any degree, touch the person of the offender. In this view of the subject, it follows that no jury was necessary, as it was a civil cause; and the appeal to the circuit court was regular, as it was a cause of admiralty and maritime jurisdiction." The question was again raised, in the case of U. S. v. The Sally (1805) 2 Cranch [6 U. S.] 406. The same objection was taken, and was again unanimously overruled. In the year 1808, it was again brought up, in the case of U. S. v. The Betsey and Charlotte, 4

Cranch [8 U. S.; 443, a seizure made in the port of Alexandria, under a law for suspending commercial intercourse with certain ports in the island of St. Domingo. The question was again most thoroughly argued against the jurisdiction, by Lee, twelve years after he argued the case of U. S. v. The Vengeance [supra]. In this argument, as is truly said by Judge Nelson, "will be found the ground and substance of all the arguments that have been urged in favor of the limited construction of the admiralty powers under the constitution." [New Jersey Steam Nav. Co. v. Merchants' Bank] 6 How. [47 U. S.] 388. It was contended, with perfect justice, by Mr. Lee, that if this was not a case of admiralty and maritime jurisdiction under the constitution, it could not be made so by congress, and in that case, the law which put such causes on the admiralty side of the court was unconstitutional. The court again, without hearing a reply, unanimously overruled the objection and sustained the jurisdiction. The first and last of these cases were fully and earnestly argued, and with such learning and ability, that, in the opinion of Judge Nelson, those who have followed on the same side have done nothing more than expand the argument and accumulate citations. They abundantly prove, what nobody ever doubted, that in England the jurisdiction of the admiralty has been, since the controversy in which Lord Coke figured, so little to his reputation either as a lawyer or a man, restricted within very narrow limits;[10] but they leave untouched the only question in which we are interested: what is the meaning of these words in the constitution? what was intended by the framers of that instrument? and in what sense they were generally understood by those who adopted it? Mr. Lee contended that they meant precisely that jurisdiction which was exercised by the high court of admiralty in England. This has been repeated by all those who have followed him on that side of the question. Indeed, when the argument for the narrow jurisdiction is reduced to its last analysis, this assumption is the only element on which it rests; an assumption

10 The state of mind in which Lord Coke went into the controversy on the subject of the admiralty jurisdiction does not deserve the respectable name of prejudice. It was mere willfulness and passion. Brown says that he hated the civil law and everything connected with it. He was undoubtedly a man of an acute and vigorous mind, but it ran in a narrow groove. No man knew better the old law of England in all its ramifications of feudal technicalities and quibbling subtleties; but this was all, except the temporary politics of the day, that he did know. He talks about the gladsome light of jurisprudence, but no one at this day will look for this light in his ponderous volumes of insufferable tediousness, in which all things are jumbled together in a perfect chaos. As a jurist, in the liberal and philosophical sense of the word, Lord Mansfield was as much his superior as light is better than darkness.

which we may be permitted to call, at least, extraordinary, for it amounts to this, that we, half a century after the adoption of the constitution, know better what was intended by those who framed and adopted it, than they knew themselves. The supreme court considered the question so clear of doubt or difficulty, that, without hearing a reply, they unanimously overruled Mr. Lee's objections. And here let it be remembered that three of the judges who concurred in these decisions were members of the convention who framed the constitution,[11] and all had taken a part, more or less active, in the discussions that preceded its adoption. It is difficult to conceive how any contemporaneous construction of a law can have a higher authority. It is now sixty years since this law was passed. During the whole of this time it has been practiced upon, and enforced habitually in every maritime district in the Union. Thousands of cases have been adjudicated, involving millions of property. Great numbers of these cases have been carried by appeal to the supreme court, and have been affirmed with the concurrence of every judge that has had a seat on that bench. If the opinion of those who contend for the English limitation of our admiralty jurisdiction is correct, that is, that our constitution is to be interpreted by the laws of England, every one of these decisions was coram non judice, an absolute nullity and incurably void.

The only real question is on the meaning of this clause of the constitution, all causes of admiralty and maritime jurisdiction; the sense in which these words were understood by those who made, and those who adopted it, for it may well be assumed that both understood the words alike. We have the contemporaneous declarations of every branch of the government, of the legislature which passed the law of Sept. 24, 1789, and of the executive who approved it, a series of deliberate and well-considered decisions of the judiciary, and the quiet assent of the people to an unbroken and unvarying practice continued for more than half a century, all concurring in one point, that the admiralty and maritime jurisdiction, under the constitution, is of larger extent than that of the English court of admiralty, and all repudiating the assumption that we are to look to the laws of England for the definition of these terms in the constitution. If this cannot now be considered as a settled question of American jurisprudence under the great organic law of the government, we may, it seems to me, well say not only that no such question is settled, but that

none ever will be or ever can be settled. And if every officer of the United States, who is intrusted with a portion of the constitutional powers of the government, is at liberty to carry those powers into practice as he understands the constitution, without any reference to the opinions of others, or to any settled and long-continued construction, this sacred instrument becomes a piece of wax, to be moulded into every variety of arbitrary and fantastic form that will harmonize with the varying idiosyncrasies of these various officers.

The only object of these observations, is, to vindicate the court in taking cognizance of causes of this description, and not to enumerate all the causes that are embraced by the terms of the constitution; and if a contract for the transportation of goods on the high seas is not a case of maritime jurisdiction, then it seems to me that there is no such case.

HUNTRESS, The (ROBSON v.). See Case No. 11,971.

---

[11] These three were Wm. Patterson, James Wilson, and John Blair. Their names appear among those who signed the constitution, and are supposed to be the same persons who were afterwards appointed judges of the supreme court.

