AMERICAN EXPORT LINES, INC.,
Appellant,

v.

John REVEL, Appellee,

WHITEHALL TERMINAL CORPORA-
TION, Appellant,

v.

UNITED STATES of America,

AMERICAN EXPORT LINES, INC., and
John Revel, Appellees,
and
American Export Lines, Inc., Cross-
Appellant,

v.

UNITED STATES of America and White-
hall Terminal Corporation, Cross-
Appellees.

No. 7787.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 22, 1959.

Decided April 8, 1959.

See also, 262 F.2d 122.

John W. Winston and Harry E. Mc-Coy, Norfolk, Va. (Seawell, Johnston, McCoy & Winston, Norfolk, Va., on the brief), for appellant American Export Lines, Inc.

Sidney H. Kelsey, Norfolk, Va., for appellee John Revel.

William E. Eley, Norfolk, Va. (Rixey & Rixey, Norfolk, Va., on the brief), for appellant Whitehall Terminal Corp.

Herbert E. Morris, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Samuel D. Slade, Atty., Dept. of Justice, Washington, D. C., and Lester S. Parsons, Jr., U. S. Atty., Norfolk, Va., on the brief), for appellee and cross-appellee United States.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

In a civil action in the District Court, judgments were entered in favor of an injured longshoreman against the owner of a vessel; for the vessel's owner against the United States, as charterer; and for the United States against the longshoreman's employer, a stevedoring company.

The longshoreman, John Revel, was injured while standing on Pier 1, U.S. Army Base, Norfolk, Virginia, helping to load the American Export Line's S.S. Executor. Export had leased space in the ship's No. 1 hold to the United States pursuant to a contract with the Military Sea Transport Service (MSTS). The contract required MSTS to supply men to load and stow the cargo aboard the Executor, and MSTS thereupon contracted with Whitehall Terminal Corporation, a stevedore, to furnish the personnel for that purpose.

The loading was done on June 9, 1956, by Whitehall's employees, who were in complete charge. A number of longshoremen testified that when they went aboard at about 8:00 A.M., the operator of the starboard winch at the No. 1 hold found that its controls were not working properly.[1] They claim to have reported the condition to the ship's mate who, according to them, instructed them to continue operating the winch "as best they could." The ship's mate and the other officers to whom he would have relayed such a report denied receiving notice of the defective condition.

At the time of the accident, Revel was working as a "slinger." As the cargo was brought to the side of the ship, he would attach a cargo hook to the load so that the winch operators could lift the draft aboard. The accident occurred when the defective winch caused a pallet, loaded with 30 drums containing calcium carbide, each weighing approximately 111 pounds, to strike the side of the vessel. The drums fell to the pier, and one of them rolled against and fractured Revel's right leg.

Before instituting this action, Revel applied for compensation benefits, which

---

1. The operator explained at the trial that when he would put the controls in a forward position, the winch would sometimes unwind instead of taking in the cable as it was supposed to. He said that this is what happened when the plaintiff was injured.

he later received from his employer, Whitehall, under the Virginia Workmen's Compensation Statute. His allegations here are that his injuries resulted from the faulty winches supplied by Export and the negligence of its employees.

Export impleaded the United States and Whitehall as third-party defendants, claiming indemnity for any recovery which Revel might obtain, on the theory that the accident resulted from the negligence of the longshoremen supplied by the United States and Whitehall. The United States, in turn, counter-claimed against Whitehall asserting that Whitehall had contracted to do the loading in a proper, skillful and workmanlike manner, and was therefore liable to indemnify the United States for any amount which might have to be paid to Export.[2]

## I.

■ Since Revel was injured while standing on the dock, (an extension of the land) his remedies are restricted to those afforded by the local law. Swanson v. Marra Bros., 1946, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045; State Industrial Comm. v. Nordenholt Corp., 1922, 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933; Cf. The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 903 and Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. This is true even though the Congress has embraced such cases within the maritime jurisdiction of the United States. Extension of Admiralty Act, 46 U.S.C.A. § 740.

## II.

■ Export submits that the terms of the Virginia Workmen's Compensation Statute preclude Revel from maintaining this action. Its argument is that the Virginia courts have construed the act to deny an injured employee recovery

at law from a statutory employer, or any person not a stranger to the business or work being performed at the time of the injury. Rather than being a stranger, Export insists that it is so intimately connected with the loading of one of its ships that the work actually constitutes part of its "trade, business or occupation."

From our examination of the Virginia cases we conclude that they do not support Export's contention. The recent case of Kramer v. Kramer, 1957, 199 Va. 409, 100 S.E.2d 37, 44 is dispositive of this issue. There, a church had engaged a carpentry contractor to enlarge its existing structure. In the course of the construction, it became necessary to erect six large trusses or arches which could not be raised into position without using a crane. As the contractor did not own a crane, a hoisting company was hired to provide one together with a crew to operate it. Erection of the trusses required the contractor's employees and those of the hoisting company to work in unison. Four trusses were raised into position by the hoisters and installed by the carpenters. A fifth, somewhat smaller than the first four, was then raised and leaned against the wall temporarily in order to clear the church floor. The carpentry contractor's employees tied the truss with a rope to keep it from falling, but a short time later the rope broke and the truss fell and struck the decedent, an employee of the hoisting company, causing fatal injuries.

When the decedent's administrators sued the carpentry contractor, it was claimed in defense that the action was barred by the provisions of the Workmen's Compensation Act. The first question which had to be decided under this defense was whether the work of raising the trusses was the business of the defendant under his contract with the church. While the contract gave

---

2. Numerous amendments and motions were then filed by the parties, but the rulings of the District Court resulted in the case going to trial with the parties in the

positions as above indicated. None of the parties appealed from the preliminary rulings of the District Court.

the defendant general supervision over the entire operation, it did not speak in specific terms of raising trusses. It was obvious, however, from their weight and size that a crane would be required to raise them into position. The defendant admitted that he did not own a crane and that the operation of cranes was not normally part of his business. There was conflict in the testimony as to whether the hoisting company had been hired by the contractor or directly by the church. The court concluded:

"In this case the evidence which the jury could accept showed that the work being done by Old Dominion Hoisting Service, an independent contractor, was not included in the carpentry contract of the defendant, Kramer, and was not a part of the trade, business or occupation of Kramer; that the decedent, whose general employer was Hoisting Service, was performing work which had some relation to the work of the defendant, but was not a part of trade, business or occupation of the defendant, and the decedent in doing that work was not 'engaged in the same work as defendant'. * * * "

The Supreme Court of Appeals of Virginia then held that an employee of one independent contractor could sue another independent contractor at common law for the negligence of the latter or his employees, even though "both contractors being engaged in work which is to become a component part of the same structure."

We think the same rule applicable here. Whether loading and unloading was traditionally performed by members of the ship's crew is not the question. In recent years such services have been performed almost exclusively by contract with stevedores, who are recognized to be in a separate and distinct occupation. McGrath v. Pennsylvania Sugar Co., 1925, 282 Pa. 265, 127 A. 780, 782; 48 Am.Jur. 211, 212. While so engaged, the employees of the stevedore are generally in complete charge.

In handling ordinary commercial freight, the shipowner is the one who contracts for the stevedoring services and his contract with the owner of the goods includes a charge for loading. In such cases the stevedore has no direct contact with the owner of the goods, and the shipowner might be, under the Virginia statute Art. 65, Sec. 27,[3] the statutory employer of the longshoremen, regardless of the fact that the shipowner never performs this function with his own employees. This we are not called upon to decide here.

In this case, Export's contract with the United States provided that the latter would supply the personnel to load its cargo; and the United States, in turn, contracted with Whitehall to provide the service. There was no contract between Export and Whitehall. In these circumstances, we hold that under Virginia law, while the loading operation was, in the Virginia Court's language, "related to the activities" of Export, it was not part of its "trade, business or occupation," and that Revel as the employee of another independent contractor may maintain this suit at common law against Export.[4]

3. Code of Virginia, 1950
  Art. 65, Sec. 27, Liability of contractor to workmen of sub-contractor, reads as follows:

  "When any person (in this and the four succeeding sections referred to as 'contractor') contracts to perform or execute any work for another person which work or undertaking is not a part of the trade, business or occupation of such other person and contracts with any other person (in this section and §§ 65-28, 65-29, 65-30 and 65-31 referred to as 'subcontractor') for the execution or performance by or under the sub-contractor of the whole or any part of the work undertaken by such contractor, then the contractor shall be liable to pay to any workman employed in the work any compensation under this Act which he would have been liable to pay if that workman had been immediately employed by him."

4. In support of its argument that loading and unloading are part of its trade, busi-

### III.

Export's next contention is that if Revel is not barred by the Virginia compensation statute, then the protection of the seaworthiness doctrine cannot be extended to him. Export's reasoning involves the following steps: (1) Seas Shipping Co., Inc. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, extended the doctrine of seaworthiness to longshoremen because they performed "seamen's work." (2) The conclusion that Revel is not barred from bringing suit by the state compensation statute must be based upon a finding that Revel was not performing work traditionally done by a seaman, and therefore not "seamen's work." (3) It would of necessity follow that the law does not extend the warranty of seaworthiness to him.

As we have just shown, Revel's right to sue does not depend on whether loading and unloading were traditionally performed by the crew, but on the relationship which existed between the parties at the time of the accident. Export is in error in assuming that, because Revel is held entitled under Virginia law to maintain suit against the ship, this involves a finding that his work was not "seamen's work" in the sense of the Sieracki decision.

### IV.

■ The shipowner further argues that the jury's finding that its negligence was a proximate cause of Revel's injury is not sustainable, because as a matter of law the defective winch was not a proximate cause of the accident. In support of this, reference is made to certain cases decided by the Court of Appeals of the Ninth Circuit. The first of these, United States v. Arrow Stevedoring Co., 9 Cir., 1949, 175 F.2d 329, is a case in which the shipowner was held free of any negligence; in no real sense was any question of proximate cause involved.

The other case upon which Export relies is United States v. Rothschild International Stevedoring Co., 9 Cir., 1950, 183 F.2d 181, where a defective winch was also involved. While both shipowner and stevedore were found negligent, the court held that the proximate cause of the accident was the stevedore's operation, not the shipowner's negligence in supplying a defective winch. The court, it is to be noted, was there concerned with a question of indemnity, not the longshoreman's right to recovery. Ryan v. Pan Atlantic S. S. Co., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 1958, 355 U.S.

ness or occupation, Export points to the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1300 et seq., of which Section 1303 provides in part:

"(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

Reference is then made to Brown and Williamson Tobacco Corp. v. The S. S. Anghyra, D.C.E.D.Va.1957, 157 F. Supp. 737 in which Judge Hoffman held the shipowner responsible for damage to cargo resulting from the negligence of the independent stevedore during the loading. Export argues that if it is responsible for loss or damage during loading and unloading, then those operations must be part of its trade or business.

The theory of the application of the Carriage of Goods Act to the loading and unloading of the ship is well set out

in A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, 896:

"The stevedore was not a meddler, nor did it inflict intentional harm. *It was an agent selected by the carrier to carry out the carrier's obligation to safely deliver and discharge the cargo as required by its contract with the shipper * * *.*" (Italics supplied.)

In this case, where the contract between the owner of the goods, the United States, and the shipowner, Export, did not contemplate loading by the carrier, and the United States contracted directly with Whitehall for this service, it is difficult to perceive how it can be maintained that the Carriage of Goods Act would make the shipowner liable for damage to goods which occurs solely as a result of the stevedore's negligence. Here the stevedore is not the agent of the shipowner.

563, 78 S.Ct. 438, 2 L.Ed.2d 491, had not yet been decided.[5]

While it is true that the Rothschild opinion spoke in terms of proximate cause, this language cannot be lifted indiscriminately and applied with equal force to the original action by the longshoreman. The court was merely comparing the respective faults of ship and stevedore. The argument pressed here by Export against Revel was equally available there, yet the court did not question the validity of the initial finding that the negligence of the shipowner was a proximate cause of the plaintiff's injury. In granting indemnity over against the stevedore, the Ninth Circuit never intended by its language to interpose a bar to the longshoreman's action against the shipowner. See Weinstock, The Employer's Duty to Indemnify Shipowners for Damages Recovered by Harbor Workers, 103 University of Pennsylvania Law Review 321, 332–335 (1954).

Even if in a particular case a finding of proximate cause was denied, this does not preclude such a finding under the facts before us. We perceive no legal infirmity in the jury's specific finding in the instant case that the winch which "reversed itself and ran backwards" was a proximate cause of Revel's injury.

## V.

█ We turn to a consideration of the judgments entered in the third-party actions. The Supreme Court recently indicated in Crumady v. The Joachim Hendrick Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, that by merely supplying defective equipment the shipowner will not necessarily be barred from recovery on his contract of indemnity. We held in Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 266 F.

2d 79, that a finding of negligence in supplying such equipment is not determinative of the shipowner's right to indemnity. His action is in contract and recovery depends upon whether his conduct has been such as to bar enforcement of the contract, and not whether he has been found negligent in regard to the longshoreman. Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491.

We find in this record no basis for a legally significant distinction from Crumady, or from Calmar.[6] The very act of supplying equipment may fairly be considered to be in contemplation of its use, and an assent to such use.

We do not attempt to explore what conduct, in other circumstances, would be "sufficient to preclude recovery." We merely hold that under the decisions of the Supreme Court the limits are not transcended here.

## VI.

█ Since we are affirming Export's judgment for indemnity, it becomes unnecessary to consider the effect of withdrawal of the appeal by the United States. The inquiry could possibly have become important only in the event of a ruling that Whitehall was not liable for indemnity. It appears from the District Court's opinion that judgment was entered for Export against the United States, and for it against Whitehall, simply because the court was uncertain whether judgment could be entered directly for the owner against the stevedore, omitting the charterer. This uncertainty has been resolved by the Supreme Court in Crumady, and it is clear now that Export may recover from Whitehall as a third-party beneficiary

---

5. In the latter case particularly the Supreme Court indicated that even in indemnity cases it is no longer appropriate to compare the negligence of shipowner and stevedore by using terms like primary and secondary, active and passive, proximate and remote. These are concepts applicable to tort actions, while indemnity is now based in these cases on contract.

6. There was no finding below as to the truth of the testimony by the longshoremen that the ship's officers were informed of the defect in the winch and assented to its continued use; and the parties having failed to argue the possible legal significance of such a finding, if made, we need not consider this aspect.

of the latter's contract with the United States.

## VII.

The question of including in the indemnity an allowance for attorneys' fees incurred in the defense of Revel's action was raised by Export in the briefs, but does not appear from the District Judge's opinion to have been raised or considered below. We leave this question open for the District Court's determination if application should be made by the shipowner.

Judgments affirmed.