Elmer FEMATT, Libelant,

v.

CITY OF LOS ANGELES, CAL., a Municipal Corporation, San Pedro Tug Boat Co., a Corporation (aka Redstack), a Corporation, Gudmund Grimstad, Respondents.

Civ. No. 262-61.

United States District Court
S. D. California,
Central Division.
June 30, 1961.

Mitchell Levy and Magana & Olney, Los Angeles, Cal., for libelant.

Roger Arnebergh, City Atty., Los Angeles, Cal., Arthur W. Nordstrom, Asst. City Atty., San Pedro, Cal., Walter C. Foster, Deputy City Atty., Los Angeles, Cal., Harry D. Miller, Jr., Deputy City Atty., San Pedro, Cal., Ekdale & Shallenberger, by Gordon P. Shallenberger, San Pedro, Cal., for respondents City of Los Angeles and Gudmund Grimstad.

Manns & Manns, William Manns, Beverly Hills, Cal., for respondent San Pedro Tug Boat Co.

KUNZEL, District Judge.

This matter comes up on respondents' exceptions to the libel, the exceptions being that the libel shows on its face (1) that it is barred by laches, (2) that it is barred by the California statute of limitations of one year, and (3) that libelant has failed to comply with the California claim statutes.

The facts in this case are set forth in Fematt v. Nedlloyd Line, D.C.S.D.Cal. 1961, 191 F.Supp. 907, a case pending on the law side of this court, No. 321–59–K, in which respondents herein are third-party defendants. After the court denied plaintiff leave to amend his complaint to name the third-party defendants as defendants, libelant filed the instant suit.

Accepting for purposes of this discussion libelant's allegations as true, we have here a "ship-to-shore" tort which was committed on navigable waters and consummated in a personal injury on the land. Ever since The Plymouth, 1866, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125, the courts in the United States have held that ship-to-shore torts were not maritime in nature and consequently without the admiralty jurisdiction of the district courts. While most of our cases have involved factual situations similar to that in The Plymouth, viz., that the damage was suffered by a shore *structure* such as a pier, there has been ample authority that the same rule applies to ship-to-shore torts resulting in injury to person. See e. g., The Mary Stewart, D.C.E.D.Va.1881, 10 F. 137; The Mary Garrett, D.C.N.D.Cal. 1894, 63 F. 1009; Price v. The Belle of the Coast, D.C.E.D.La.1894, 66 F. 62; The H. S. Pickands, D.C.E.D.Mich.1890, 42 F. 239; The Albion, D.C.Wash.1903, 123 F. 189; Netherlands American Steam Nav. Co., v. Gallagher, 2 Cir., 1922, 282 F. 171. The doctrine may be explained thus:

"In cases of tort the locality alone determines the admiralty jurisdiction. Only those torts are maritime which happen on navigable waters. If the injury complained of happened on land, it is not cognizable in the admiralty, even though it may have originated on the water." The Mary Stewart, supra, 10 F. 138.

These cases seem to say that the ship-to-shore tort is by its nature not a maritime one and is therefore not litigable in admiralty. See the Netherlands American Steam Nav. Co. case, supra, 282 F. 176:

"Inasmuch as the action is one ex delicto, we must inquire whether the tort complained of is a maritime tort. If it be such a tort, it is within the admiralty jurisdiction; otherwise not * * *."

It is by now familiar what the inequities of this doctrine are supposed to be. If the vessel is the tortfeasor, the "shore entity" must sue in some law forum where the doctrine of contributory negligence *may* be applicable; but if the "shore entity" has committed the tort, the vessel may nevertheless sue in admiralty where comparative negligence is

applied. See Gilmore & Black, Admiralty 432 (1957), and the cases collected in Robinson, Admiralty 50 (1939). Legal writers for a long time urged, partially on this ground, that the "locality" test of jurisdiction be swept aside by Congressional action. See Robinson, supra, p. 50, note 121; 1 Benedict, Admiralty 353 (text and note 9) (6th ed. 1940). A judicial hint that Congress could do so was given in Taylor v. Lawson, D.C.E.D. S.C.1932, 60 F.2d 165. But all these discussions centered upon the factual setting of The Plymouth, i. e., a ship-to-shore-structure tort; and no mention was ever made of the personal injury facet of the problem. Indeed, the first known proposed statute mentioned only damage to shore property. See 42 Harv.L.Rev. 563 (1929).

Congress finally enacted the Admiralty Extension Act, 62 Stat. 496 (1948), 46 U.S.C.A. § 740, which provides in pertinent part:

> "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

> "In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water * * *."

It will be noted from legislative history of the Act, specifically Sen.Rep. No. 1593 (June 11, 1948), 1948 U.S.Code Cong. Serv.1898, that the express intent of Congress was to "overrule" Martin v. West, 1911, 222 U.S. 191, 32 S.Ct. 42, 56 L.Ed. 159; Cleveland Terminal R. R. Co. v. Steamship Co., 1908, 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508; and The Troy, 1908, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512. None of these cases involved injury to person. There is no mention in the Senate Report or in any of the accompanying letters of injury to person.

The Senate Report did contain the following note:

> "Adoption of the bill will not create new causes of action. It merely specifically directs the courts to exercise the admiralty and maritime jurisdiction of the United States already conferred by article III, section 2 of the Constitution and already authorized by the Judiciary acts. Moreover, there will still remain available the right to a common law remedy which the Judiciary Acts * * * have expressly saved to claimants."

■ To cope with such language is certainly difficult. If the Supreme Court in The Plymouth held that ship-to-shore torts are not maritime in nature and thus not within the admiralty jurisdictional grant of Art. III, § 2 of the Constitution, nothing that Congress does can change that. If, on the other hand, that which is much the more likely occurred in The Plymouth, that ship-to-shore torts were only held to be without the scope of the Judiciary Acts, Congress can surely remedy that. This, after all, is a familiar theory expounded in dealing with the language used in the Constitution and identically in the Judiciary Acts with respect to jurisdiction of the district courts over cases arising under the Constitution and laws of the United States. But the language of the Senate Report " * * * and already authorized by the Judiciary acts" is inconsistent with every case which had theretofore dealt with ship-to-shore torts. The Admiralty Extension Act must surely be interpreted to broaden the scope of the Judiciary Acts with respect to these torts as much as the Constitutional grant will permit. Compare the Supreme Court's upholding of the Ship Mortgage Act of 1920, 41 Stat. 1000, 46 U.S.C.A. § 911, in The Thomas Barlum, 1934, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176.

Beyond the Constitutional grant Congress of course may not go. As the Supreme Court said in The Thomas Barlum,

supra, 293 U.S. at page 44, 55 S.Ct. at page 38:

"But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction."

See also O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 40, 63 S.Ct. 488, 491, 87 L.Ed. 596:

"There is nothing in that grant of jurisdiction * * * to preclude Congress from modifying or supplementing the rules of that law as experience or changing conditions may require. This is so at least with respect to those matters which traditionally have been within the cognizance of admiralty courts * * *."

It may be granted that Congress has the power to set aside, and has in fact set aside, the "locality" test for admiralty jurisdiction over ship-to-shore torts. It may not be so quickly granted that the Act is constitutional, at least where the tort results in injury to person. The validity of the Act has twice been upheld in settings where the injury was inflicted upon a shore structure. American Bridge Co. v. The Gloria O, D.C.E.D.N.Y. 1951, 98 F.Supp. 71; United States v. Matson Nav. Co., 9 Cir., 1953, 201 F.2d 610. Those rulings are, of course, not questioned here. In one personal injury case the court took jurisdiction without discussion. Hovland v. Fearnley & Eger, D.C.E.D.Pa.1952, 110 F.Supp. 657.

In the Matson case, supra, the reasoning of Judge Stephens is analytical to be sure. The Constitutional grant of admiralty jurisdiction is to be measured by reference to the intent of the framers of the Constitution itself, to their conception of the admiralty and maritime law. An Act of Congress to be upheld must be "within the scope of admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted." The Genesee Chief, 1851, 12 How. 443, 453, 53 U.S. 443, 453, 13 L.Ed. 1058. The scope of jurisdiction is not merely that which was actually exercised by the Colonies and England herself.

"[T]he Constitutional grant must be liberally construed to encompass all that can be included in the ancient laws, customs, and usages of the sea, not only in England before the restrictive statutes were passed, but also in the maritime courts of all other powers of Europe." 201 F.2d 615, summarizing the theory of Mr. Justice Story in De Lovio v. Boit, C.C.D.Mass.1815, 7 Fed.Cas. 418 (No. 3,776).

Judge Stephens' final stroke is this:

"Damage to a land structure by a ship, historically and through experience and usage, has been generally made cognizable in foreign maritime courts. The jurisdiction of the English admiralty courts over such torts, after centuries of prohibition by the kings, common law courts, and Parliament, was restored in 1861. And injuries to shore structures by ships have long been recognized as maritime torts by the Continental courts." 201 F.2d 615.

The authority relied upon in the Matson case for English law is The Admiralty Court Jurisdiction Act, 1861, 24 & 25 Vict., c. 10, § 7:

"The High Court of Admiralty shall have Jurisdiction over any Claim for Damage done by any Ship."

The authority for Continental law is the Ordonnance de la Marine of Louis XIV, 1681, L.I. tit. 2, art. 7:

"[The judges of admiralty] shall also take cognizance of the damages done to the keys, banks, moles, palisadoes, and other works cast up against the violence of the sea, and shall take care that the depth of the ports and roads be preserved and kept clean." English trans., 4 Benedict, supra, 356–357.

On the Ordonnance, see also Gilmore & Black, supra, 8, note 27.

The bare language of the English Admiralty Court Jurisdiction Act, supra,

would indicate that it applied to ship-to-shore torts involving injury to person as well as to property. The number of reported cases discussing this statute is not large, and they deal only with injury to shore structures and injury to persons either aboard ship or actually in navigable water. The Beta, 38 L.J.Adm. 50, 20 L.T. 988; The Sylph, 37 L.J.Adm. 14, 17 L.T. 519; The Uhla, 37 L.J.Adm. 16, 19 L.T. 89; The Guldfaxe, 38 L.J.Adm. 12, 19 L.T. 748.

There are several provisions of the Ordonnance, supra, which suggest the admiralty jurisdiction of cases like the instant one:

art. 1: "The judges of the Admiralty shall take cognizance * * of all that concerns the construction, tackle, and furniture, arming, victualling and manning, sale and adjudication of ships."

art. 6: "[The judges shall take cognizance] of the ways appointed for hauling up ships coming from the sea if there be no regulation, title or possession to the contrary."

art. 8: "[The judges] shall take up the bodies of drowned persons, and shall draw up a report of the condition of the corpses found at sea and on the sand, or in the ports * * *."

art. 9: "[The judges] shall be present at the musters and reviews of the inhabitants of the parishes subject to the sea watch, and shall take cognizance of all differences arising upon that account, and likewise of crimes committed by them that are upon the guard of the coasts, while they are under arms."

art. 10: "[The judges] shall also take cognizance * * * of all crimes and offences committed upon the sea, its ports, harbors and shores." English trans., 4 Benedict, supra, 356–357.

These and other provisions of the Ordonnance, including that cited by the court in the Matson case, demonstrate a breadth of such proportions as would make it anomalous indeed if a tort like that in the instant case were not included. While the proof is far from conclusive, the force of the language of the Ordonnance and of the Admiralty Court Jurisdiction Act is strong enough, it seems to me, to hold that the present tort is a maritime one and that Congress could constitutionally place it under the admiralty jurisdiction of the district courts. Jurisdiction over the present controversy, therefore, rests on 28 U.S.C.A. § 1333(1), as further defined by the Admiralty Extension Act.

■ Respondent City of Los Angeles contends that the Admiralty Extension Act does not apply in this case because respondent does not "believe the Statute contemplates a suit which does not include either the vessel or its owners." No authority either in the case law or in the legislative history of the Act has been found for such a proposition. Libelant's suit is based upon negligence. The instrumentality of the commission of the tort was a spring line of the vessel. Since Congress has said that the suit may be brought *in personam*, and since it has nowhere said that the tortfeasor must be the owner of the vessel, the applicability of the Act to the instant case is not open to doubt. Cf. Hovland v. Fearnley & Eger, supra.

■ Since this case involves a maritime tort there is no question whatsoever that maritime law, including the doctrine of laches, applies to all phases of the case. See The Key City, 1871, 14 Wall. 653, 81 U.S. 653, 20 L.Ed. 896; and Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, cited by respondents for the proposition that despite the Admiralty Extension Act libelant's "remedies are restricted to those afforded by local law," was an action brought on the civil side of the court and did not involve the question of laches. Even if that case could be squared with the *earlier* Kermarec case, it is hardly in point here.

■ Respondents finally urge that the libel be dismissed because libelant has failed to comply with certain California claims statutes setting forth conditions precedent to bringing suit against a municipal corporation. On page 3 of respondent City of Los Angeles's reply brief it is stated:

"Libelant makes the point that the Claims Statute does not apply because maritime law must be uniform. If this were a maritime cause of action we would agree * * *."

The uniformity of the maritime law is indeed paramount. The precise question has been answered in favor of the libelant's position in Frame v. City of New York, D.C.S.D.N.Y.1940, 34 F.Supp. 194.

The exceptions to the libel are overruled, reserving however, the question of the existence of laches at a separate hearing or upon the trial.