**SOUTH PORT MARINE, LLC, Plaintiff,**

v.

**GULF OIL LIMITED PARTNERSHIP and BOSTON TOWING & TRANSPORTATION COMPANY, L.P., Defendants.**

**No. CIV. 98–20–P–H.**

United States District Court, D. Maine.

July 26, 1999.

Daniel G. Lilley, Daniel G. Lilley Law Offices, David J. Perkins, Perkins, Olson & Pratt, Portland, ME, for Plaintiff.

William H. Welte, Welte & Welte, P.A., Camden, ME, for Deft. Gulf Oil Corp.

Leonard W. Langer, Thompkins, Clough, Hirshon & Langer, Portland, ME, Brian P. Flanagan, Flanagan & Hunter, Boston, MA, for Deft. Boston Towing & Trans.

## ORDER ON DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S JURY DEMAND AND ON PLAINTIFF'S MOTION TO AMEND COMPLAINT

HORNBY, Chief Judge.

The Supreme Court has devoted a considerable amount of its attention in the past forty years to Seventh Amendment jurisprudence, preserving the right to jury trial in federal courts in "suits at common law." All those cases have involved distinguishing between common law and equity, since jury trial historically was available, and therefore constitutionally required, in the common law courts but not in equity. Routinely, however, the Supreme Court has also observed that at the time of ratification of the Seventh Amendment, the courts had three bases of jurisdiction—common law, equity and admiralty—and that jury trial was available only in the first, *see e.g., City of Monterey v. Del Monte Dunes, Ltd.,* —— U.S. ——, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999); *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d

365 (1987). In this lawsuit under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701–2761, for damages to a shoreline marina caused by gasoline spilling from a barge in navigable waters, I must distinguish between admiralty and common law to determine whether there is a constitutional right to jury trial.[1] I conclude that such ship-to-shore injuries were not within the admiralty jurisdiction in 1791, but were cognizable instead at common law. Accordingly, under recent Supreme Court jurisprudence, the plaintiff has a Seventh Amendment right to jury trial.

## I.  FACTUAL BACKGROUND

In the early morning hours of February 5, 1997, the defendants were pumping 93–octane gasoline from Gulf Oil Limited Partnership's onshore facility into Boston Towing & Transportation Company's barge located in navigable waters. During the transfer, between 20,000 and 30,000 gallons of gasoline spilled overboard from the barge into Portland Harbor. This gasoline drifted into the plaintiff's marina, causing physical damage to the docks. The plaintiff claimed that the following damages resulted from this spill: (1) physical damage to its docks; (2) business interruption; (3) lost slip revenues due to a resulting delay of dredging operations; (4) loss of goodwill; and (5) business stress.

The plaintiff's complaint contained counts under the Oil Pollution Act, under the general maritime law and under state common law (strict liability/ultrahazardous activity, negligence, trespass and nuisance), and sought both compensatory and punitive damages. On the day that trial was originally scheduled to commence, the defendants conceded liability under the Oil Pollution Act, but moved to strike the claim for punitive damages, on the grounds that such damages are not available under the Oil Pollution Act and that the Oil Pollution Act preempts any other law that would provide for such damages. After turning its attention to Maine's Coastal Conveyance Act, 38 M.R.S.A. §§ 541–560, the plaintiff conceded that *state* statutory law preempts all its state common-law claims. I then ruled that under *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), the Oil Pollution Act preempts any federal common-law (*i.e.,* general maritime law) claims[2] and that punitive damages are not available under the Oil Pollution Act. That left only the compensatory damages under the Oil Pollution Act. I granted the plaintiff a short continuance in light of the changed complexion of its case. In the interim, although a jury had already been impaneled, the defendants then moved to strike the plaintiff's demand for a jury trial. I reserved ruling and submitted the case to the jury, on the explicit understanding that the jury's verdict would be advisory if I ruled ultimately that the plaintiff had no right to a jury trial.

I instructed the jury that under the Oil Pollution Act it could award compensation for (i) physical damage to the plaintiff's property (the dock damage); (ii) lost profits, past and future (comprising both the business interruption and the lost slip revenues); and (iii) other economic losses resulting from the spill (damage to goodwill and damages based on business stress). The jury awarded $181,964 for property damage, $110,000 for lost profits, and $300,000 for other economic losses.

After the return of the verdict but prior to entry of judgment, the parties briefed the jury trial issue. The plaintiff also submitted a written motion to amend the complaint to plead diversity of citizenship as a basis of jurisdiction,[3] on the theory

---

1.  There is no argument here that this Oil Pollution Act cause of action belongs under equity jurisdiction.

2.  I rejected the plaintiff's unsupported assertion that some body of federal common law

other than the general maritime law might apply to this case.

3.  On the first day of trial, the plaintiff had stated orally that it would seek to amend its

that it would enhance its jury trial argument. For the reasons that follow, the defendants' motion to strike the jury demand is DENIED; and the plaintiff's motion to amend the complaint is DENIED.

## II. DISCUSSION

### A. Waiver

The plaintiff claims that the defendants waived any objection to the use of a jury in this case by waiting until the eve of trial to make their motion to strike. According to the defendants, they moved to strike the jury demand the moment the motion became ripe, namely when the state-law claims were dismissed.

The issue here really is not one of waiver because the court can deny an inappropriate request for a jury without a party's motion. See Fed.R.Civ.P. 39(a). Had the defendants suffered a jury trial in silence, I would not hesitate to hold that they had consented to a jury trial under Rule 39(c). In this case, however, on the eve of trial the defendants opposed the use of a jury. Since there was at least doubt whether there was sufficient consent to satisfy Rule 39(c), I exercised my discretion not to order such a trial and initiated instead an inquiry under Rule 39(a) as to the plaintiff's right to a jury trial.

On the first day of trial, moreover, I informed the parties that, should it turn out that the plaintiff has no right to a jury trial, the jury already impaneled would be advisory only. In other words, even assuming that the defendants at one time had consented to a trial by jury, I ordered that there should be no jury trial unless the plaintiff has a right to such a trial. The plaintiff voiced no objection to my refusal to order a jury trial by consent but confined its objection to the timeliness of the defendants' motion to strike. Accordingly, I reject the plaintiff's "waiver" argument and reach the merits of the issue.

complaint to plead diversity of citizenship if necessary.

### B. Right to Jury

By endorsing its complaint with a jury demand, the plaintiff demanded a jury trial in accordance with Rule 38. See Fed. R.Civ.P. 38(b). Accordingly, the case must be tried by a jury unless I find that no right to jury trial exists. See Fed.R.Civ.P. 39(a)(2).

There is no statutory right to jury trial in this case. The Oil Pollution Act—the basis for the plaintiff's only remaining cause of action at the outset of trial—simply does not address the subject. The sole question, therefore, is whether the Seventh Amendment confers a right to jury trial.

The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S. Const. amend. VII. Everyone knows what twenty dollars means (notwithstanding 200 years of inflation) but "Suits at common law" is no longer a customary phrase for lay people, and even many lawyers have lost familiarity with what that phrase means after decades of modern pleading rules. Historically, the framers recognized three basic types of courts existing at the time the Constitution and, later, the Seventh Amendment were ratified-common law courts, equity courts and admiralty courts. Jury trials were available then only in the common law courts, and that is what the Seventh Amendment preserves—a jury trial in cases that would have been common law cases in 1791. Accordingly, when a modern Congress creates by statute a federal cause of action—as it has in the Oil Pollution Act—the determination of whether that federal cause of action carries a constitutional right to jury trial requires a historical analysis of whether it approximates a common law cause of action in 1791.[4]

4. I reject the plaintiff's argument that apart from the Oil Pollution Act it has a right to jury

Specifically, the Supreme Court has instructed: "To determine whether a statutory action is more analogous to cases tried in courts of law than to suits tried in courts of equity *or admiralty*, we examine both the nature of the statutory action and the remedy sought." *Feltner*, 523 U.S. at ——, 118 S.Ct. at 1284 (emphasis added). Examination of the "remedy sought" in recent Supreme Court caselaw has focused mostly on damages, often a distinguishing criterion of common law courts as opposed to their equity counterparts (equity typically issued injunctions, specific performance, or other forms of relief), *see City of Monterey*, —— U.S. at ——, 119 S.Ct. at 1638, 1647 n. 1 (citing *Curtis v. Loether*, 415 U.S. 189, 195–96, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974))(Scalia, J., concurring). This criterion is of little utility in distinguishing common law from admiralty (at least where the claim is *in personam*), however, because the admiralty courts also traditionally awarded money damages to a successful litigant and typically did not afford the conventional equitable remedies. *See generally* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 1–14 at 43 (2d ed.1975). Following *Feltner*, I turn, therefore, to the nature of the statutory cause of action here. The Oil Pollution Act provision under which the plaintiff is proceeding permits recovery of compensation for a "ship-to-shore" injury-damage caused to shoreline structures by an event that occurred in navigable waters. What does history tell us about the nature of such lawsuits?

I will not pretend to be familiar with pre–1791 cases, either in England or the Colonies. The lawyers have not briefed that subject and I have not pursued the historical research independently.[5] The first case generally cited in this context

comes from Maine in 1813, an opinion by Supreme Court Justice Story, riding circuit, in *Thomas v. Lane*, 23 F. Cas. 957 (C.C.D.Me.1833). He wrote:

> In regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never (I believe) deliberately claimed to have any jurisdiction over torts, except such as are maritime torts, that is, such as are committed on the high seas, or on waters within the ebb and flow of the tide.

*Id.* at 960.

It has generally been assumed that Justice Story correctly defined admiralty jurisdiction as it existed at the ratification of the Constitution. In that day and age, a tort occurred where the injury was actually suffered, not where the negligent act alone occurred. Consequently, in 1865 in *The Plymouth*, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1865), Justice Nelson cited *Thomas v. Lane* and declared explicitly that federal admiralty jurisdiction did not encompass cases where, although the wrongful act occurred on the navigable waters, the harmful consequence was experienced on land (in *The Plymouth*, a fire that spread from a ship on the Chicago River to a wharf). Instead, any remedy for such damage had to be obtained in a common law court. *See id.* at 36–37; *accord Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 411, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); *Johnson v. Chicago & Pac. Elevator Co.*, 119 U.S. 388, 396, 7 S.Ct. 254, 30 L.Ed. 447 (1886) (both cases involving a vessel running into a shore-based structure).

---

trial under *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963). Unlike the plaintiff in *Fitzgerald*, the plaintiff here did not go to trial on a separate issue that carried a right to jury trial. The Oil Pollution Act is and was all the plaintiff had.

**5.** I will observe that much of the conflict between admiralty and common law jurisdiction in this country and in England seems to have been centered on the right to jury trial. *See Waring v. Clarke*, 46 U.S. (5 How.) 441, 467–500, 12 L.Ed. 226 (1847) (Woodbury, J., dissenting, Daniel and Grier, JJ., joining).

In 1904, in *The Blackheath (United States v. Evans)*, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236 (1904), Justice Holmes criticized the scope of the principle established by *The Plymouth*, and recognized admiralty jurisdiction over damage by a ship to a beacon because, although the beacon was affixed to the channel bottom and thereby "attached to the realty," *id.* at 364, 25 S.Ct. 46, it was also "a government aid to navigation" and "only technically land, through a connection at the bottom of the sea," *id.* at 367, 25 S.Ct. 46. Justice Brown, concurring, announced that the effect was to "practically" overrule *The Plymouth*. *Id.* at 368, 25 S.Ct. 46. Justice Brown was wrong.

In 1925, the Supreme Court again declared that admiralty jurisdiction did not extend to injuries to land. In *The Panoil*, 266 U.S. 433, 45 S.Ct. 164, 69 L.Ed. 366 (1925), the Court held that there was no admiralty jurisdiction where a ship damaged a dike, even though the dike owner argued that the dike was an aid to navigation as in *The Blackheath*. According to the Court, "[t]he dike constitutes an extension of the shore, and must be regarded as land. The mere fact that its presence may affect the flow of the water and thereby ultimately facilitate navigation is not enough to bring the injury within the admiralty jurisdiction." *Id.* at 435. The Court reaffirmed the vitality of *The Plymouth* in 1935 in *The Admiral Peoples*, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935), recognizing again this limitation on federal admiralty jurisdiction and the availability of common law relief. The Court concluded that admiralty jurisdiction "does not extend to injuries caused by a vessel to persons or property on the land. Where the cause of action arises upon the land [*i.e.*, common law] is applicable." *Id.* at 651, 55 S.Ct. 885. Most recently, in 1995, Justice Souter for the Court reiterated *The Plymouth*'s limitation on admiralty jurisdiction for cases before 1948:

The traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist. *See, e.g., Thomas v. Lane*, 23 F.Cas. 957, 960 (No. 13902) (CC Me. 1813) (Story, J., on Circuit). This ostensibly simple locality test was complicated by the rule that the injury had to be "wholly" sustained on navigable waters for the tort to be within admiralty. *The Plymouth*, 3 Wall. 20, 34, 18 L.Ed. 125 (1865) (no jurisdiction over tort action brought by the owner of warehouse destroyed in a fire that started on board a ship docked nearby). Thus, admiralty courts lacked jurisdiction over, say, a claim following a ship's collision with a pier insofar as it injured the pier, for admiralty law treated the pier as an extension of the land. *Martin v. West*, 222 U.S. 191, 197, 32 S.Ct. 42, 43, 56 L.Ed. 159 (1911); *Cleveland Terminal & Valley R. Co. v. Cleveland S.S. Co.*, 208 U.S. 316, 319, 28 S.Ct. 414, 415, 52 L.Ed. 508 (1908).

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). Without question, therefore, at any time before 1948, a plaintiff like Southport here could not have proceeded in admiralty to recover damages for the gasoline spill from the barge that affected its docks and business. It would have had to seek any such remedy at common law.

What changed in 1948 was enactment of the Extension of Admiralty Jurisdiction Act, 62 Stat. 496 ("the Admiralty Extension Act"). That statute provides that admiralty jurisdiction "shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. App. § 740. In other words, Congress rejected the limits on admiralty jurisdiction that the Supreme Court had consistently imposed, and legislatively extended admiralty jurisdiction to

a cause of action like that asserted in *The Plymouth* and here. *See Jerome B. Grubart, Inc.*, 513 U.S. at 532, 115 S.Ct. 1043; *California v. S.S. Bournemouth*, 307 F.Supp. 922, 925 (C.D.Cal.1969) ("The legislative history clearly indicates that the Act makes available a concurrent remedy in admiralty for the *existing common-law action*. No new cause of action was contemplated by Congress in passing the Act; rather those causes of action which the cases have termed 'ship-to-shore' torts now have a new form of relief available in admiralty.") (emphasis added).[6]

The resulting problem is apparent: Assuming that Congress has the constitutional power thus to enlarge the admiralty jurisdiction,[7] admiralty courts do not usually provide jury trials, and the Admiralty Extension Act does not recognize a right to jury trials. Yet before 1948, a suit like this one had to be at common law, where jury trial would be available, and the Seventh Amendment preserves the right to jury trial at common law.

One other Supreme Court admiralty decision requires discussion. In *The Genesee Chief (Propeller Genesee Chief v. Fitzhugh)*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), prior to *The Plymouth*, Chief Justice Taney found constitutional Congress's extension of admiralty jurisdiction to the Great Lakes. *See id.* at 457. Previously, the Supreme Court had held that the constitutional grant of admiralty jurisdiction extended only as far as the ebb and flow of the tides, relying on old English precedents. In the face of the commercial needs of the young nation and the international border with Canada, Congress legislatively extended the admiralty jurisdiction beyond the ebb and flow of the tides to "certain cases upon the lakes and navigable waters connecting the same." *Id.* at 451. The statute was defended as an exercise of Congress's interstate commerce powers, but Taney rejected that argument.

---

**6.** Both the First Circuit's and this District's recognition that ship-to-shore injuries are within the admiralty jurisdiction, *see Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652, 670, 672 (1st Cir.1980); *Burgess v. M/V TAMANO*, 370 F.Supp. 247, 249 (D.Me.1973), postdate the Admiralty Extension Act and cite *S.S. Bournemouth*.

**7.** The Supreme Court appears to have assumed, without deciding, that the Act is constitutional. *See, e.g., Victory Carriers, Inc. v. Law*, 404 U.S. 202, 209–10, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 209, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). In 1953, the Ninth Circuit ruled on the constitutionality of the Admiralty Extension Act and analyzed it along the lines of *The Genesee Chief*, observing that continental courts had long recognized ship damage to shore structures as maritime-related and that jurisdiction of the English admiralty courts was extended to such torts in 1861. The Ninth Circuit concluded ultimately that "such accidents" were "within 'the admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted,'" *United States v. Matson Navigation Co.*, 201 F.2d 610, 615 (9th Cir.1953) (quoting *The Genesee Chief (Propeller Genesee Chief v. Fitzhugh)*, 53 U.S. (12 How.) 443, 453, 13 L.Ed. 1058 (1851))— in other words, that *The Plymouth* and all its progeny were wrongly decided. A federal trial judge in California, perhaps fortified by the Ninth Circuit decision, reached the same conclusion. *See Fematt v. City of Los Angeles*, 196 F.Supp. 89, 91, 93 (S.D.Cal.1961). The *Fematt* court quoted language from the Senate Report that the Admiralty Extension Act only directed the courts to exercise the admiralty jurisdiction they already had under the Constitution, cited the later 1861 English parliamentary legislation restoring the admiralty power over ship-to-shore torts and summarized continental authority that allegedly recognized such jurisdiction in admiralty before 1791. But *Fematt* said that "[t]o cope with such language [of the Senate Report] is certainly difficult" and that it was "inconsistent with every case which had theretofore dealt with ship-to-shore torts." 196 F.Supp. at 91. One federal district court has confronted explicitly the jury trial issue under the Admiralty Extension Act. It ruled that the denial of jury trial was constitutional, relying, at least in part, upon earlier Supreme Court decisions recognizing Congress's ability to "'alter, qualify or supplement'" maritime law. *American Bridge Co. v. The Gloria O*, 98 F.Supp. 71, 73 (E.D.N.Y.1951) (quoting *The Thomas Barlum*, 293 U.S. 21, 43, 55 S.Ct. 31, 79 L.Ed. 176 (1934)). This decision predates the Supreme Court's modern jurisprudence on jury trials, which I discuss later in text.

He found that Congress had not advanced that basis of power in the legislation and that the measure must rise or fall constitutionally as admiralty jurisdiction. *See id.* at 452–53. He proceeded to uphold the measure and, in the course of the decision, explained that the earlier Supreme Court precedents on jurisdiction simply had been wrong—that the American experience and geography demanded a different rule than England's ebb and flow of the tides limitation.[8] In other words, although he found the congressional extension of jurisdiction constitutional, he did so by ruling that the earlier precedents should have recognized admiralty jurisdiction as a matter of judge-made law. What is more, he noted that "[t]he principal objection made to the admiralty jurisdiction is the want of the trial by jury," *id.* at 458, and that in the case of the Great Lakes Act, jury trial had been specifically provided by Congress. Later cases have interpreted *The Genesee Chief* as recognizing the admiralty jurisdiction on the Great Lakes solely as constitutionally and judicially created, thereby making the Congressional statute "obsolete and of no effect"—with one important exception: the right to jury trial survives as a legislative proviso, because jury trial is otherwise unknown in admiralty. *The Eagle,* 75 U.S. (8 Wall.) 15, 25, 19 L.Ed. 365 (1868).

There are two obvious and important differences between *The Genesee Chief* and this case. First, the Supreme Court has never decided that its numerous precedents declaring ship-to-shore injuries outside admiralty jurisdiction have been an incorrect historical interpretation of the scope of admiralty jurisdiction as it existed when the Constitution and the Seventh Amendment were ratified. (Indeed, *The Plymouth* was decided some fourteen years *after The Genesee Chief.*) Instead, it has always reaffirmed that limitation on admiralty, but for the effect of the Extension Act. Second, unlike the Great Lakes Act, in enlarging federal admiralty jurisdiction into a common law arena the Admiralty Extension Act does not provide a statutory right to jury trial, and the Seventh Amendment issue therefore cannot be avoided.[9]

■ I return to the Supreme Court's jury trial cases. The Supreme Court's modern jury trial jurisprudence begins with cases like *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and continues as recently as this year in *City of Monterey.* None of these cases involves admiralty; all are conflicts between common law and equity jurisdiction. But those jury trial cases clearly give precedence to the common law and to jury trial in any competition, and I see no principled basis to treat admiralty any differently than equity for such purposes.[10] The Supreme Court has regularly

8. In *Waring,* a divided court rejected another English limitation on admiralty jurisdiction—that it could not extend to waters wholly within a county's territorial limits. Although its history was attacked by the dissent, the majority held that the admiralty jurisdiction of the pre-Revolution colonies had been broader than that of England and determined the constitutional scope of admiralty. Jury trial was the dissent's major concern. The dissent does cite much earlier authority that seems to support Justice Story's statement in *Thomas v. Lane* that location of the tort is critical. *See Waring,* 46 U.S. at 482–83, 46 U.S. 441 (Woodbury, J., dissenting).

9. Judge Ashur Ware, a judge from this District well known for his admiralty opinions, recognized the tension between the Seventh Amendment and the admiralty jurisdiction. In a jurisdictional note to his 1840 opinion in *The Huntress,* 12 F. Cas. 984, 988 (D.Me. 1840) (the note being added in 1849 when Reporter Edward H. Daveis, Esq. published the case), he rejected the idea that the Seventh Amendment could restrict the scope of admiralty jurisdiction. He made two arguments: first, that the Seventh Amendment would not apply to admiralty cases because "these are not suits at common law"; second, that in any event Congress could provide for a jury trial in admiralty as necessary.

10. Indeed, admiralty's nonjury practice was one of the Colonies' grievances at the time of the Revolution. *See Waring,* 46 U.S. at 484 (Woodbury, J., dissenting), quoting John Jay

referred to them in equivalent terms. *See Feltner,* 523 U.S. at ——, 118 S.Ct. at 1284 ("The Seventh Amendment thus applies not only to common-law causes of action, but also to 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity *or admiralty.*' *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (citing *Curtis v. Loether,* 415 U.S. at 193, 94 S.Ct. 1005)" (emphasis added)). If the Seventh Amendment preserves the right to jury trial at common law and if this action for damages caused by a ship's pollution traveling to shore structures would have been cognizable only at common law when the Seventh Amendment was ratified, then the jury trial right prevails. Congress simply cannot extend either equity or admiralty jurisdiction into areas where the common law traditionally provided the remedy, without preserving the right to jury trial.[11]

In its most recent case on the Seventh Amendment this year, the Supreme Court has reiterated the test. In deciding whether there is a right to jury trial we make

two principal inquiries. "[W]e ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was." *Markman v. Westview Instruments Inc.,* 517 U.S. 370, 376, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." *Ibid.*

. . . The Seventh Amendment thus applies not only to common-law causes of action but also to statutory causes of action "'analogous to common-law causes of action ordinarily decided in English law courts in the late eighteenth century, as opposed to those customarily heard by courts of equity *or admiralty.*'"

*City of Monterey,* —— U.S. at ——, 119 S.Ct. at 1638 (emphasis added). Here, right or wrong, the Supreme Court cases are uniform in declaring that ship-to-shore injuries were recognized historically only at common law, not in admiralty. Thus, the Oil Pollution Act cause of action for damage to shoreline structures resulting from pollution by a vessel on navigable

---

in the "Old Congress" of 1774, an address of October 21, 1774, to the people of Great Britain. Perhaps the Colonies objected in particular to nonjury trials when the Crown was a party in interest (revenue cases, crimes). In any event, the lack of a jury in admiralty was well-known and the Seventh Amendment was ratified in a context of hostility to any reduction of the common law right to jury trial.

11. The "saving-to-suitors" clause in the Oil Pollution Act, 33 U.S.C. § 2751(e) ("saving to suitors in all cases all other remedies to which they are otherwise entitled"), does not affect my decision. An argument could be made as follows:

The Seventh Amendment preserves the common law right to trial by jury as it existed in 1791. The only common law right that existed as of 1791 in cases involving ship-to-shore injuries was a right to a jury in state court in a suit under state

substantive law (or, possibly, a right to a jury in a diversity case in federal court, which at that time—under the pre-*Erie* construction of the Rules of Decision Act— would be tried under the general common law as discerned by a federal judge, in the absence of a state statute). Since the Oil Pollution Act by its terms does not preempt state law or suits in state courts, *see* 33 U.S.C. §§ 2717(c), 2751(e), the jury trial right has been preserved in the very condition in which it existed in 1791.

This logic may be appealing in the abstract, but it is inconsistent with the settled doctrine of the Supreme Court jury trial caselaw discussed in text. The cases hold that the Seventh Amendment does not merely preserve the state of the right as of 1791, it also preserves the right in suits under new federal legislation that are analogous to suits tried at common law in 1791. The cases are not concerned with whether the original common law right continues to exist independently.

waters is a statutory cause of action analogous to a late eighteenth century common law action. Under the principles of *City of Monterey*, although the Admiralty Extension Act extends admiralty jurisdiction over this cause of action, the plaintiff has a constitutional right to jury trial.[12]

### C. Motion to Amend to Assert Diversity Jurisdiction

██ My ruling on jury trial largely moots the plaintiff's late motion to amend its complaint to assert diversity of citizenship as an alternative basis of jurisdiction. The court clearly has jurisdiction under the Oil Pollution Act. *See* 33 U.S.C. § 2717(b). Diversity jurisdiction is an afterthought advanced solely to support the argument that this case is actually on the "law" side of the court's docket, as opposed to the "admiralty" side, and thereby independently entitled to a jury trial. Because

my ruling on the jury trial issue is a matter of first impression and may be appealed,[13] however, I will proceed to rule on the motion to amend as well. (I do not decide whether the existence of diversity jurisdiction would actually affect the right to jury trial.)

██ I DENY the late motion. The plaintiff had every opportunity to plead diversity of citizenship in its original and first amended complaint but did not do so. There is no reason for the plaintiff to have delayed amending its complaint until this time, and the delay will cause prejudice to the efficient administration of justice. Moreover, the amendment would be futile without a reopening of the record.

The burden is on the plaintiff to prove diversity. The plaintiff is a citizen of Maine. The only evidence in the record that bears on the defendants' citizenship is

---

**12.** My decision is limited to the statutory cause of action in this case. I note that the Oil Pollution Act authorizes a wide variety of lawsuits and remedies, and not all of these may qualify as suits at common law.

Generally speaking, the statute authorizes two classes of remedies: suits for removal costs and suits for damages. *See* 33 U.S.C. § 2702(a). The removal costs covered, *see* 33 U.S.C. § 2702(b)(1), are analogous to removal costs covered under other federal environmental laws, like CERCLA, *see* 42 U.S.C. § 9607(a)(4)(A) & (B). Suits for CERCLA removal costs have been held to be suits for equitable relief with no right to jury trial. *See, e.g., Town of Jaffrey v. Town of Fitzwilliam*, 846 F.Supp. 3,6 (D.N.H.1994). *But see New York v. Lashins Arcade Co.*, 881 F.Supp. 101, 102 (S.D.N.Y.1995), *aff'd on other grounds*, 91 F.3d 353 (2d Cir.1996). The broad class of damages available under the statute, *see* 33 U.S.C. § 2702(b)(2), certainly constitutes legal relief rather than equitable relief, but, as I have noted, it does not follow that a suit to recover such damages would be a suit "at common law" in every case. I can certainly imagine suits for damages under the statute that would look like an 18th century libel in admiralty (*e.g.* injuries to personal property caused on the high seas by a spill from a vessel on the high seas, *see* 33 U.S.C. § 2702(b)(2)(B)).

**13.** Not only is this apparently the first reported decision on the right to jury trial under the

Oil Pollution Act, but it also appears to be the first to analyze the Supreme Court's jury trial cases in a situation involving admiralty arguments. The lawyers' briefs did not approach the issue in the way I have done, nor did they argue many of the cases I have cited. I recognize that this may be only the first word on this very interesting issue. The National Oceanic and Atmospheric Administration disagrees with me. 57 Fed.Reg. 8964, 8988 (1992). Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), courts generally must defer to an agency's reasonable construction of a statute if two conditions are met: (i) the statute is one that the agency administers; and (ii) "Congress has not directly addressed the precise question at issue." *Id.* at 842–43, 104 S.Ct. 2778. The *Chevron* rule does not apply where an agency's interpretation of a statute "would raise serious constitutional problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Here, the issue is not whether the NOAA's interpretation of the Oil Pollution Act is correct (clearly the *statute* does not provide for a jury trial); it is whether the agency has correctly interpreted Article III, the Seventh Amendment, the Judiciary Act of 1789, or the Admiralty Extension Act, none of which qualifies as a statute that the agency administers. Accordingly, I give the NOAA statement no deference.

a stipulation on the third day of trial that both defendants are Delaware limited partnerships. Just because the defendants are Delaware limited partnerships, however, does not mean that their citizenship is diverse. A limited partnership is a citizen of every state of which its general partner or any of its limited partners is a citizen. *See Halleran v. Hoffman,* 966 F.2d 45, 47 (1st Cir.1992) (citing *Carden v. Arkoma Assocs.,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990)).[14] If the plaintiff were allowed to amend its complaint now, I would have to reopen the evidentiary record to resolve the issue of complete diversity. This is not a matter merely of receiving affidavits; it requires the use of full-blown trial procedures. *See Lussier v. Runyon,* 50 F.3d 1103, 1105–06 (1st Cir.1995). In light of the posture in which the plaintiff has presented this issue, I am unwilling to do that.

### III. CONCLUSION

Accordingly, both the defendants' motion to strike the jury trial demand and the plaintiff's motion to amend the complaint are DENIED.

The case is now ready for the Clerk to enter judgment in accordance with the jury's verdict.

**SO ORDERED.**

---

**14.** At the close of the plaintiff's case, the plaintiff stated that it would seek a stipulation that both defendants are out of state corporations with their principal places of business out of state, in order to avoid having to "call their [the defendants'] people" to prove diversity of citizenship. (The proposed stipulation referred to the defendants as corporations, even though one of the reasons for amending the initial complaint had been to correct the erroneous designation of the entities as corporations rather than limited partnerships. *See* Pl.'s Mot. to Amend. [Initial] Compl.; *compare* Compl. at ¶¶ 2–3 *with* Amend. Compl. at ¶¶ 2–3.) The defendants would not stipulate. After a recess, the plaintiff returned with a stipulation that both defendants are "Delaware limited partnerships." In other words, the plaintiff returned with a stipulation that did not obviate the need to present evidence of complete diversity; nonetheless, the plaintiff rested its case.